## McElhenny's Appeal.    Hubert Oil Company.

1. In order to bring a party into liability for profit on property sold to a company, he must have occupied a fiduciary relation to it, so that money received by him to his own use was by means of his fraud, money of the company.

2. In such case equity has jurisdiction but does not give damages, but a restoration of the thing wrongfully taken, that is the money received, or an equal sum and interest.

February 24th 1869.    Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Certificate from Nisi Prius: In Equity: No. 69, to January Term 1869.    Appeal by the administrators of William McElhenny, deceased.

On the 16th of March 1866 the Hubert Oil Company filed a bill against Patrick McElhenny and H. B. Black, administrators, &c., of William McElhenny, deceased, and Thomas Riddle.    The bill set out:—1. That the plaintiffs were a corporation under the Act of July 18th 1863 for incorporating mechanical, mining and manufacturing companies, and its supplements.    The articles of association, dated November 19th 1864, stating that the object was to acquire and hold a tract of 95 acres of land on Two Mile Run, three and a-half miles from Franklin, Venango county, adjoining the Scott and Lambert Farm, and to mine for oil, &c.    The principal office to be in Philadelphia.    Letters patent were issued January 11th 1865, the land was conveyed to the company, much labor, money, &c., have been expended without profit, the company having been deceived as to the character of the land, and defrauded of large sums of money in procuring the land, as follows.    2. The decedent, who lived in Venango county, formed the project for getting up a company, and putting upon it the said lands, which were worthless, pretending that they were his own, and were worth $40,000, and obtaining for himself a large sum of money without expenditure by him.    3. That in September or October 1864 he made a secret agreement with Daniel Baird and John Cunningham, trading as Baird & Cunningham, Samuel Boyd, Daniel Boyd, and James Boyd, trading as Samuel Boyd & Co., Robert Boyd and Thomas Riddle, who were to aid him in his intended fraud, and to receive a share of the profits.    4. That a subscription paper had been prepared by which the subscribers agreed to pay the several amounts set opposite their names toward the stock of the Hubert Oil Company, to be formed upon the above-mentioned 95 acres of land, be paid to James Boyd, one-half on subscribing, one-fourth on the 15th, and one-fourth on the 30th of November 1864; Baird and Samuel Boyd to visit the land, and if satisfied, to have a good title made to the company; Robert Boyd, James

Boyd and three others named, to be corporators and procure letters patent.   McElhenny, Riddle, Baird & Cunningham, Samuel Boyd & Co. and Robert Boyd signed the paper for sums from $2000 to $5000 ; but no money was paid or intended to be paid.   5. By means of these fictitious subscriptions other persons were induced to subscribe to the amount of $25,000.   The additional subscribers had no knowledge of the land, but relied upon seeing the names of Baird & Cunningham, &c., who professed to have knowledge of the land, and supposing all were to be on an equal footing, subscribed, and paid their subscriptions in full, according to the conditions.   6. That McElhenny combined with Riddle, Baird and the Boyds, so that they should not be required to pay their subscriptions, and also that he would pay to them a portion of the money of the proposed corporation received from the bonâ fide subscribers.   7. That after the incorporation the decedent and his confederates obtained the control of the offices, electing Robert Boyd president, James Boyd a director and treasurer.   8. That the other officers of the company, supposing the land to be as represented, belonging to the decedent, and worth $40,000, money of the company was taken by Robert and James Boyd from the treasury, ostensibly to pay Baird as agent of the decedent, who gave fictitious receipts, dated in November and December 1864, for $40,000.   9 & 10. That the land was not the decedent's, was unfitted for an oil company, and not worth for any purpose more than $2000 or $3000 ; that the land at the date of the subscription and two of the receipts, belonged to one Hubbard, who on the 7th of November 1864 conveyed to one Mitchell, who on February 1st 1865, whilst Robert Boyd was president, conveyed it to the company, the deed omitting the recital of title and having revenue stamps for $40,000, the actual purchase-money to the decedent having been but $1850.   11. That $25,000 which had been paid by bonâ fide subscribers was taken from the treasury, of which the decedent received $14,083.34, less what was paid to Mitchell; Riddle received $1666.66, and Baird and the Boyds $9250.   12. That the decedent, Riddle, Baird and the Boyds, who had subscribed for stock to the amount of $15,000, swore in the affidavit to the articles of association that that sum had been paid, when in fact they did not pay their subscriptions, but notwithstanding obtained 30,000 shares of stock. * * 14. That the decedent and Riddle can retain nothing but what they actually paid for the land.   15. That Baird and the Boyds have settled with the company and made restitution.   16. That the decedent died in June 1864, and administration of his estate has been granted to P. McElhenny and Black, and that the defendants refused to make restitution.

The prayer was that the defendants may account for and restore the money so improperly received by them and interest, and pay

the amount due on their subscriptions with interest and for further relief.

The administrators answered that for want of knowledge they neither denied nor admitted the allegations. They also demurred for reasons not necessary to state. A replication was filed, and S. C. Perkins, Esq., appointed examiner.

Riddle filed an answer which requires no notice, as he afterwards settled with the plaintiffs, and the bill as to him was dismissed by consent.

The plaintiff gave in evidence a subscription corresponding with that set out in the bill, signed by the decedent, Samuel Boyd & Co., Baird & Cunningham, Robert Boyd and Riddle, to the amount of $15,000, and by other subscribers to the amount of $35,500; also the deed from Hubbard, as stated in the bill. Also the articles of association, dated November 19th 1864. Letters patent dated January 11th 1865. Deed from Mitchell, dated February 21st 1865.

James Boyd, for plaintiffs, testified that Baird & Cunningham, Robert Boyd, Samuel Boyd & Co. and Thomas Riddle made an agreement with McElhenny that if they got $40,000 for the land they were to get an equal share of the profits. McElhenny said the land was his own, and was to cost $12,000, and that was what he was to charge for it: the difference between $12,000 and $40,000 was equally divided; the amounts were paid from what had been received by the witness for subscriptions; those who participated in the profits gave checks for their subscriptions, which were returned to them when the matter was settled up. McElhenny received $12,000 as purchase-money, and $2083.34 as his share of the profits; $35,000 were paid in cash to the treasurer, of which sum $10,000 was working capital. On cross-examination witness said the company was got up in the fall of 1864. McElhenny merely put the land into the hands of the others for the purposes of sale; their profits were to be their compensation for assisting him to sell.

Samuel Boyd, for plaintiff, testified that the committee to examine the land reported that it was as McElhenny represented it. Witness testified further in substance as James Boyd. On cross-examination he said that the agreement for the division of the profits was three months before any steps had been taken to organize the company; McElhenny took very little part in getting subscriptions to the stock.

Daniel Baird, for plaintiff, testified that he first saw McElhenny about the land in August or September 1864.

SHARSWOOD, J., after referring to the facts, &c., delivered the following opinion at Nisi Prius:—

* * * "I cannot doubt for a moment that so far as the first prayer of the plaintiff goes, this case is within the jurisdiction of

the Court of Equity. Lord Hardwicke, in Chesterfield *v.* Janssen, 2 Vesey 155, said: 'This court has an undoubted jurisdiction to relieve against every species of fraud,' and of the celebrated classification which he then proceeds to make, it would not be difficult to show that the circumstances of this case will fall under any one of them. Here was on the part of Mr. McElhenny both *suppressio veri* and *suggestio falsi.* He concealed and misrepresented the cost of the land to his immediate associates, the original projectors, and joined with them in still further concealing and misrepresenting the facts to the other subscribers, who united with them in the formation of the corporation plaintiffs. The principle is well settled, and is founded in simple honesty between man and man in transactions of this character between parties and associates in a common adventure, in which confidence is and must necessarily be reposed in each other. Mr. Lindley, in his excellent Treatise on Partnership 494, has well stated it. · 'Good faith requires that a partner shall never obtain a private advantage at the expense of the firm. He is bound in all transactions affecting the partnership to do his best for the common body, and to share with his copartners any benefit which he may have been able to obtain from other people, and to which the firm is in honor and conscience entitled.' And he cites not only the Digest to show that the civil law, which has been well styled a code of written reason, fully sustains this principle, but numerous reported decisions of English courts maintaining and illustrating it. It is observable that several of these were in chancery, and the jurisdiction of that court to give relief in such cases was scarcely questioned. They are mostly cases too like this in many respects, of subscribers and stockholders in joint-stock companies: Hickens *v.* Congreve, 1 Russ. & My. 150; Fawcett *v.* Whitehouse, Id. 132; The Society of Practical Knowledge *v.* Abbott, 2 Beav. 559, and Beck *v.* Kantorowics, 3 K. & J. 330. It may be that the plaintiffs could recover at law either in assumpsit under a count for money had and received or in an action on the case for a deceit. But that will not arrest the jurisdiction of equity, for it is to be remembered that fraud is classed by all the elementary writers under the head of the concurrent jurisdiction, and a court of equity has the superior advantages of enforcing a discovery by searching the conscience of the fraudulent party, and of settling the sometimes long and complicated accounts to which such transactions give rise. It matters not that in this case neither discovery nor an account were necessary. The plaintiff has been able to present his case without either, but it might not have been so.

"It has been objected also that at the time these frauds were perpetrated, and the money received by McElhenny, the plaintiffs were not in existence as a corporation, and there is therefore no privity to sustain this proceeding. I had occasion to consider

this question in another place, and my opinion is to be found in the Legal Intelligencer of July 19th 1867, p. 228 : Steamship Co. *v.* Murphy. The cases of Edinboro Academy *v.* Robinson, 1 Wright 210, and The Bedford Railroad Co. *v.* Bowser, 12 Wright 29, I think sustain the position that persons who associate with a view to the future organization of a corporation, are trustees, who may be called to account for what they have received by the corporation when actually created.

"I cannot, however, make a decree to enforce the payment of McElhenny's subscription of $2000 to the stock of the plaintiffs, however desirable it might be to include all matters in controversy between these parties in one decree. It is a claim entirely distinct and independent of that which I have been considering, and the authority of Strasburg Railroad Company *v.* Echternacht, 9 Harris 220, is conclusive and to the point that for the violation of the contract of subscription, though made before the date of the charter, the remedy at law is full, complete and adequate.

"I ought perhaps to notice the first ground of demurrer, though it was not insisted on at the hearing, that the bill does not aver that there is any personal estate belonging to the decedent, or that any such estate has come into the hands of the defendants, his administrators. In Pennsylvania, as I understand it, a decree in equity against executors or administrators settles no more than does a judgment at law the liability of the estate. To the Orphans' Court alone belongs the jurisdiction to call them to account and to decree the distribution of the amount with which they may be found chargeable among the creditors in a due course of administration.

"We have in the examinations and proofs all the materials of a decree without the delay and expense of sending the parties to a master. The defendants have set up nothing by way of discharge and allowance in their answer, and of course they are to be credited with what appears in the plaintiff's testimony.

"Let it be decreed that the defendants, Patrick McElhenny and H. Burton Black, administrators of William McElhenny, deceased, do refund and pay to the plaintiff out of the assets which now are or may hereafter come into their hands belonging to the estate of the decedent, William McElhenny, the sum of $9083.34, with interest from the 11th day of January 1865, together with the costs of this suit, and by consent bill dismissed as to Thomas Riddle."

McElhenny's administrators appealed from the decree, and assigned it for error.

*P. Archer, Jr.* (with whom was *L. C. Cassidy*), for appellants.— The case is not cognisable in equity, but in the Orphans' Court: Act of June 16th 1836, § 19, Pamph. L. 1, Purd. 764, pl. 8;

Brightly's Eq. 460; 1 Story's Eq. Jur., § 53. McElhenny dealt at arm's length and had a right to get all he could for his land: Cornelius v. Molloy, 7 Barr 293; Eagan v. Call, 10 Casey 236; Caldwell v. Boyd, 7 P. F. Smith 321; Kintzing v. McElrath, 5 Barr 469; Bank of London v. Tyrrell, 5 Jurist N. S. 927; Read v. Maquay, 25 Beav. 586; Foss v. Harbottle, 2 Hare 480; Hitchens v. Congreve, 4 Russ. 574; Densmore Oil Co. v. Densmore, 25 Legal Int. 12; Laidlaw v. Organ, 2 Wheat. 195; Chesterfield v. Jaanson, 2 Ves. 155.

*E. S. Miller* (with whom was *C. B. Penrose*), for appellees.— A promoter of a company stands in a fiduciary relation to his associates and cannot make profit out of his dealings with them: Lindley on Part. 495, 497; Hickens v. Congreve, 1 R. & M. 150; Aberdeen R. R. v. Blaikie, 1 Macqeen 469; Benson v. Heathorn, 1 You. & Col. Ch. 326; Bank of London v. Tyrrell, 5 Jurist N. S. 924; Gaskell v. Chambers, 26 Beav. 360; Fawcett v. Whitehouse, 1 R. & M. 132; Beck v. Kantorowicz, 3 K. & J. 230; Foss v. Harbottle, 2 Hare 489; The Society of Practical Knowledge v. Abbott, 2 Beav. 559. See also Kimmell v. Geeting, 2 Grant's Cas. 128; Hill v. Frazier, 10 Harris 320; Sugd. on Vendors, Ch. 20, § 2; Remick v. Butterfield, 11 Foster N. H. 70.

The opinion of the Court was delivered, May 11th 1869, by

THOMPSON, C. J.—The plaintiffs below claimed a decree against the defendants as administrators of their intestate McElhenny, on an allegation of fraud in a sale to them by the intestate and others, of a certain tract of land in Venango county, as and for oil territory. In order to bring the intestate's estate into liability to the company for money received by him in payment for the land, it must be made to appear that he occupied some fiduciary relation to it, so that the receipt of the money, although received by him for his own use, was, by means of the fraud practised in his fiduciary relation, money of the company. It is not damages in a case like this that equity gives, it is restoration of the thing wrongfully taken, viz., the money received, or an equal sum and interest. The testimony shows that McElhenny offered the land in this city to certain parties— Messrs. Baird and others—as oil territory, and which the proof showed it was believed to be, some two or three months before the formation of the Hubert Oil Co. That he asked $12,000 for it (he said it had cost him that), and a share of the profits to be made by the purchasers from him, in case they put it into a company at the sum of $40,000. An association of several persons was formed and they agreed to take the land from him on these

11 P. F. SMITH—13

terms, and subscribed in shares of different amounts, to make the sum up. Before offering the land to a company, a committee of these promoters visited the land and reported favorably as to the probability of its being oil territory. The description in the deed and papers show that it was situated between Franklin, Venango county (where the first oil discoveries were made), and Oil Creek (where the greatest developments of oil have occurred), at about three miles distant from the former, and six or seven from the latter. Geographically considered there was good reason for the belief that on this lot were oil deposits, as well as on either side of it. The testimony was, that parties were boring for oil on the land when the committee went to view it, and that there was a good show for oil upon it.

Mr. Boyd, one of the buyers from McElhenny, and a promoter of the Hubert Oil Company, states the contract between McElhenny and his associates thus : " The land was to cost us $12,000. McElhenny said the land cost $12,000. That's what he was to charge us. We were to sell it for $40,000, and were to make the profit : the difference between $12,000 and $40,000 he was to have a share of." This is substantially what all the witnesses agree was the arrangement. The manner of disposing of the property, no doubt was by a sale intended to be made to a company, but not necessarily so, if the same price could be obtained otherwise. These purchasers from McElhenny soon got up a subscription for the purpose of raising the sum of $40,000, to pay for the land, and beyond that a sum sufficient to commence operations upon. Forty-seven thousand dollars were subscribed and paid in money and checks to the associators, and an association was formed for the incorporation of the Hubert Oil Company, the capital of which was fixed at $500,000—100,000 shares, of the par value of $5 per share.

It nowhere appears that McElhenny, the purchaser from Hubert, the original owner, did it as the agent of Messrs. Baird, Boyd & Co. and others, although he bought it to sell again, no doubt. He had a perfect right therefore to deal with them at arm's length, as it seems he did, and what he said about the cost of the property does not appear to have been relied upon as the inducement on their part, for they sent a committee to examine the land, who reported favorably to a purchase on the terms proposed, and they contracted as already stated. McElhenny did not become an associate. It is true his name appears as a subscriber to the extent of $2000, to raise capital to found the company. It is doubtful whether he subscribed himself or not, but if he did, there is not a particle of evidence to show that he subscribed with any doubt of the character of the land as oil territory. The witnesses agree that from location and appearance, the property could have been sold as oil territory, after the purchase

from McElhenny, to others for from $40,000 to $50,000. But it is not for deceit nor for a rescission of the contract that this bill is filed, but for a restoration of money wrongfully obtained from the company, in the shape of profits. If the property was not purchased by McElhenny for the use and as agent of the company, but for his own use (and this is the proof in the case), he might sell it at a profit most assuredly. No subsequent purchasers from his vendees would have any right to call upon him to account for the profits made on his sale. The parties to whom he sold, have never asked him to account to them for the profit at which he sold to them. They have not pretended that he was their agent in making the purchase, and I am unable to understand the ground of a right in the company to demand it. The difference between the sum he paid, and that at which he sold, he was as fairly entitled to as to the sum paid. Seeing no evidence of agency, or of a trust, or a fiduciary relation between the plaintiff and the defendants' intestate thus far, we are of opinion that there was error in decreeing payment of any portion of the profits made by him in the sale to the promoters of the Hubert Oil Co.; and to the extent of $7000, this decree is to be modified.

There was nothing to be made by the charge in the bill, that "McElhenny was not the owner of the land when he sold it." The company got it by a deed of conveyance from the vendor of McElhenny, by arrangement between it and its vendors, and they have it. They obtained what they bargained for, and the manner of conveyance must have been their own choice. It resulted from the contract with McElhenny.

At this point another inquiry arises, is the estate of McElhenny liable in equity to refund to the company the share of the profits received by him over the sum of $12,000? We are inclined to think it is. After the contract and sale to Baird, Boyd and others, he associated with them, as purchaser at $40,000, on which to found a company; thus they became buyers and sellers to and for the company. The rule seems to be settled in numerous cases, not necessary to be cited, as they have to some extent been referred to, in Simons and Weeks v. The Vulcan Oil Co. (postea p. 202), that the promoters of such companies, when they buy to form a company, and their purchases are taken by the company, they cannot make profits on these sales. Their position must be regarded as one of trust and confidence. McElhenny, by his subscription, whether made or authorized by him, contributed to give the appearance of a purchase of the land that was not real, and was far beyond what he and the other associators gave for it if it had been real. After selling to Baird, Boyd and others, and then joining them in selling to the company, he assumed their position and liabilities, and if they could not make a profit, he could not. That they could not, results from the fact

[McElhenny's Appeal.]

that they professed to buy for the company in purchasing from McElhenny. Good faith requires that they be held to that position, and he with them. His estate should therefore be required to contribute from its assets, if they be sufficient, a sum equal to the profits received by him from the company, in the sale by the promoters to it, namely, the sum of $2083.34, with interest from 12th Dec. 1864, and to pay costs, excepting the costs of this appeal, which the appellee is ordered to pay. Let a decree be entered in form to this effect.

SHARSWOOD, J., dissented.