In re WYOMING VALLEY ICE CO.

(District Court, M. D. Pennsylvania. May 3, 1907.)

No. 559.

1. CORPORATIONS—REORGANIZATION—CONSOLIDATION OF COMPETING COMPANIES—BONDS AND STOCK ISSUED TO PROMOTER—CONSIDERATION—VALIDITY.

Upon the reorganization of an ice company, the promoter took an option on the capital stock, amounting to $25,000, for which he agreed to pay $75,000, and at the same time secured an agreement from the owner, who controlled another ice company, that the latter company would not engage in the wholesale or retail ice business in the same territory; he on his part agreeing that the ice company, upon being reorganized, would take a certain quantity of ice at certain prices annually. He also secured similar options upon the business and property of two other ice companies, for which he was to pay cash and assume debts to the amount of $15,000. Armed with these options and agreements, he proceeded to enlist others in the enterprise, securing from them $90,000 in money, of which $75,000 was to be used to buy the $25,000 of stock bargained for, and the balance to pay the other obligations incurred; the understanding with these parties being that, when the reorganization of the company was effected, the stock of the company should be increased to $225,000, and bonds to the extent of $90,000 be issued, the bonds to be distributed among the parties according to the amounts which they had severally contributed and a certain percentage of the stock be given them as a bonus. This arrangement was carried out, and the reorganization proceeded with; the original stock being assigned and transferred to the promoter and his associates for the purpose. New directors having been selected from among their number, the options and agreements were then purchased from the promoter, $90,000 of bonds and $200,000 of increase stock being voted to him therefor, which bonds and increase of capital they at the same time authorized as stockholders. The value of the property and business of the ice company at the time of the reorganization was approximately $75,000, the price paid for the stock to the original holders, and that of the other companies, which were bought out, about $27,500, subject, however, to some $10,000 of indebtedness which was assumed and paid; these values being somewhat augmented by the freedom from competition secured by the consolidation and the economies made possible thereby. The company having become bankrupt, upon the sale of its real estate by the trustee and the distribution of the proceeds to lien creditors:

(1) Held, that in determining what the promoter contributed to the company in return for the stock and bonds turned over to him, as affecting the validity of the bonds, the property of the company itself had necessarily to be left out of consideration, belonging as it already did to the company, together with the good will and business, which could not be optioned away by the original stockholders if they had undertaken to do so, as they did not, nor sold back again to the company by the assignment of the option agreement. Nor was this to be saved by the suggestion that by the assignment of the agreement the stock secured by it was transferred to the company, which thus became the beneficial owner, the stock so acquired having been paid for by the money contributed for the purpose by the parties to whom it was distributed, by whom such money was advanced with the understanding that the stock was to be so disposed of; and the option, as so exercised by the promoter having performed its functions, there was nothing left to this feature of the agreement when turned over to the company.

(2) Held, further, that the consideration to the company for the $90,000 bonds and $200,000 of stock, which were voted to the promoter by himself and his fellow directors, was thus brought down to the property secured by the agreements with the other two companies, amounting all told to

$27,500, incumbered with $10,000 of debts, and to the advantages to result by the removal of competition, which were altogether prospective and problematical.

2. SAME—CHARTER AUTHORITY—RIGHT TO BOND FOR BORROWED MONEY.

*Held*, also, upon the showing so made, that as against excepting creditors the bonds were not valid obligations of the company under the authority given by the charter to borrow money and bind the property and franchises of the company by mortgage not exceeding one-half the capital stock at the time the loan should be made; the transaction with the promoter, by which bonds and stock were voted to him in return for the agreements which he was to turn over, by no liberality of construction being able to assume the character of a loan.

3. SAME — CONSTITUTIONAL AND STATUTORY RESTRICTIONS — FICTITIOUS INCREASE OF INDEBTEDNESS.

It being provided by the state Constitution (article 16, § 7), as well as by the general corporation act of April 29, 1874 (P. L. 81), that no corporation shall issue stock· or bonds except for money, labor done, or money or property actually received, and that all fictitious increase of stock or indebtedness shall be void, the bonds and stock in the present. case, being issued in disregard of this, were invalid; not that the agreements turned over by the promoter and the property and business thereby secured were devoid of all value, but the present actual value of that which they represented was comparatively so slight, and the prospective value, upon which alone the transaction could be justified, was so speculative, that the obligations given in return must be regarded as colorable and fictitious within the meaning of the Constitution, and therefore void.

4. SAME—PRESENT VALUES TO GOVERN.

Even though the parties participating may have hoped that some day the securities would approximate the figures given to them, they could not fail to know that this was not the case at the time, and it is by this that the validity of the transaction is to be determined.

5. SAME—RIGHT OF CREDITORS TO QUESTION—EXISTING CREDITORS—INNOCENT PURCHASERS.

The bonds being void by the Constitution, the right of creditors to question them cannot be doubted; not, of course, in the hands of innocent purchasers, but that is not the case where, as here, both stock and bonds were held by parties who participated in their issue. Nor can the excepting creditors be said to have come in after the bonded indebtedness had been contracted, and so not be in a position to question it, being affected by conditions as then established; the obligation which was the basis of the judgments due them having arisen out of the agreement to take a certain yearly quantity of ice, made with the promoter and confirmed by the company, whereby it anticipated the bonded indebtedness, if that was material.

6. SAME—UNEXECUTED GIFT—NOTE OR BOND OF MAKER.

But, in addition to this, the bonds, being mere promises to pay in the hands of the original parties, were no more at best than voluntary obligations, not enforceable as against the claims of those to whom the company was actually indebted; the gift of a note or bond by the maker not being executed except by payment.

7. SAME—SATISFACTION OF BID BY BONDS—EXCEPTIONS TO SALE.

While, then, as to all over and above the value actually contributed, the bonds were a gift—although to the extent of such value this may not have been the case, and, as representing advances made to the company, upon general distribution, the holders might to that extent have a right to come in—as bonds, secured by a mortgage lien on the property and franchises of the company, made void by the Constitution, they could not be used to satisfy the bid of a purchaser at a trustee's sale, according to the local practice, and the sale, · unless otherwise complied with, must therefore be' set aside.

·On Exceptions to Report of Referee.

George R. Bedford, for exceptions.

W. S. McLean, opposed.

ARCHBALD, District Judge.   At the sale by the trustee of the real estate of the bankrupt corporation the property was purchased by George R. McLean, as attorney for bondholders, for $40,000, who, after paying $1,650 in cash to recover the costs, was permitted, in conformity with the state practice in cases of judicial sales, to receipt for the balance of his bid in bonds of the company, secured by a first mortgage on the property, the lien of which was divested by the sale.   A return of sale to this effect having been made by the trustee, exceptions were taken by the Bear Creek Ice Company and the Albert Lewis Lumber Company, judgment creditors, which were dismissed by the referee and the sale confirmed, the proceeds as the result being appropriated pro rata to the payment of the bonds, and it is the propriety of this disposition that is now in question.   The exceptants claim that the bonds are invalid, not having been issued for value, but having been given to the parties, by whom they are now held for money advanced with which to buy up the capital stock of the company, and to a small extent also to secure the business and property of certain other companies, altogether inadequate to meet the requirements of the law.

The facts are not in dispute, and are in substance as follows:   The Wyoming Valley Ice Company was incorporated by act of assembly of April 15, 1869 (P. L. 1870, p. 1415), with a capital stock of $25,000, divided into 1,000 shares of $25 each, and an authorized capital of ten times that amount.   And on February 12, 1901, Albert Lewis, being the owner of 690 of such shares, gave an option in writing to Dr. H. N. Young to sell him the same at $75 a share; Dr. Young undertaking to buy the shares of other stockholders at the same figure.   It was at the same time further agreed by Mr. Lewis, acting on behalf of the Bear Creek Ice Company and the Albert Lewis Lumber Company, both of which he controlled, that these companies would abstain from engaging in the wholesale or retail ice business in the Wyoming Valley as they had been doing theretofore, or from selling to other parties there, Dr. Young on his part undertaking that the Wyoming Valley Ice Company which was thus turned over to him and to which the Bear Creek Ice Company had previously been furnishing ice, should take from the said company, for a period of ten years, 12,000 tons of ice annually at certain prices; a contract to this effect being subsequently executed with these companies.

The purpose of Dr. Young was to consolidate and control the ice business in the section designated, and, following upon the option obtained from Mr. Lewis, he secured another from Isaac Stauffer and Daniel G. Callahan, doing business as the Pocono Ice Company, by which they were to sell him the property of that company for $50,000—that is to say, $5,000 in cash and $45,000 in stock of the Wyoming Valley Ice Company, part of an increase of it to $225,000, which was contemplated—Stauffer and Callahan at the same time agreeing that they would not, directly or indirectly, engage or become interested in the ice

business within the territory sought to be monopolized, and Stauffer further undertaking individually to deliver 10,000 tons of ice annually, which Dr. Young was to pay for at certain designated prices: Actuated by the same idea, Dr. Young a few days later also secured from E. D. Cramer, president of the Summit Lake Ice Company, an option on the capital stock and property of that company for the sum of $28,000, payable in the stock of the Wyoming Valley Ice Company as so to be increased, Mr. Cramer engaging not to enter into the ice business within the territory named, and Dr. Young agreeing to pay off the indebtedness of the company, which amounted to $10,000.

Armed with these several options and agreements, Dr. Young then proceeded to enlist other parties in the enterprise, securing from them an advance of $90,000, of which $75,000 was to be used to pay Mr. Lewis and the other holders of the existing stock of the Wyoming Valley Ice Company—1,000 shares at the agreed price of $75 a share; and the balance, $15,000, was to pay the $5,000 cash to Stauffer and Callahan, and to take care of the $10,000 of obligations of the Summit Lake Ice Company. This money was advanced by the parties who went into the arrangement, upon the understanding that, when the reorganization of the company was effected and the proposed increase of stock had been authorized, they should receive bonds of the company to the amount which they had severally contributed, and a certain per cent. of the increase stock as a bonus.

The so-called reorganization of the company was then proceeded with. The original $25,000 of capital stock was assigned and turned over by Mr. Lewis and the other holders of it to the parties whom Dr. Young designated; and on March 15, 1901, the old directors having resigned, new directors and officers were chosen, Dr. Young being one of them and the others being taken from those who were associated with him. Immediately following this the new board met —only four, however, of the six being present, with Dr. Young among them—and a resolution was passed that the agreements and options which he held with Lewis, Stauffer, and Cramer, and the companies which they severally represented, should be purchased of him by the Wyoming Valley Ice Company for $90,000 of the bonds of the company and $200,000 of its capital stock, when the stockholders should have authorized the issuing of the bonds and the increase of the capital; a meeting of the stockholders for that purpose being called for the next day. The agreement of Dr. Young with the Bear Creek Ice Company and the Albert Lewis Lumber Company to take a certain quantity of ice yearly was also accepted. and the officers of the company were directed to execute a contract to this effect with them, which was done the same day. On March 16th the stockholders took action on the proposed issue of bonds and increase of stock, further notice being waived, and the whole 1,000 of existing shares were voted in favor of it. This was followed on April 1st, by a meeting of the directors, at which by formal action it was resolved that, in consideration of the options and agreements held by Dr. Young and the property and business thereby acquired and controlled which he undertook to sell, the company should issue to him in payment thereof $200,000 of the capital stock (the increase voted), and make and issue coupon bonds

to the amount of $90,000, to be secured by a first mortgage on the franchises property and contracts of the company. Dr. Young thereupon duly executed and delivered assignments to the company of the agreements referred to, receiving in return the stock and bonds which he was to get, and the transaction was complete. The stock and bonds so received were subsequently distributed by him among his associates according to the preceding arrangement with them, and it is the validity of the bonds in his and their hands, as stated above, that is now in controversy. The value of the property and business of the Wyoming Valley Ice Company at the time of the transfer was approximately $75,000, the price paid to Mr. Lewis and the others for the stock which represented it; that of the Pocono Ice Company was about $15,000; and that of the Summit Lake Ice Company some $12,500, subject, however, to the $10,000 indebtedness which was assumed and paid. The freedom from competition secured by the consolidation of these companies, and the economies made possible thereby, no doubt somewhat augmented these values, but certainly not to the extent which is claimed, of which the subsequent bankruptcy of the company is proof, if there were nothing more.

In determining just what Dr. Young contributed to the company in return for the stock and bonds turned over to him, the property of the company itself has, of course, to be left out of the consideration. That already belonged to the company together with the good will and business, and could neither be optioned away by Mr. Lewis, if he had undertaken to do so, as he did not, nor sold back again to the company by the assignment of the agreement with him. The $75,000, therefore, which represents its value drops out of the case. Nor is it saved by the suggestion that the original $25,000 of stock was embraced in the agreement with Mr. Lewis, and that by the assignment of that agreement it was transferred to the company, which thus became the beneficial owner. This agreement only covered in reality Mr. Lewis' 690 shares. But that is not material. The point is that the 1,000 shares of stock acquired of him and the others in the transaction were paid for out of the money contributed by the parties associated with Dr. Young, by whom it was advanced with the distinct understanding that it was to be so used; and it was distributed to them in order that the reorganization of the company on March 15th might be effected. The option with Mr. Lewis, having been exercised in this way, had no further purpose, and on March 27th when Dr. Young assigned over the agreement to the company of which it formed a part, there was nothing left to this feature of it. This is not to deny that the company could buy and hold or retire its own stock if that was what was actually intended. But far from this the capital stock was increased, not to $200,000, but to $225,000, which left the original $25,000 unaffected in the hands of the parties to whom the certificates had been severally assigned, and by whom, so far as appears, it is still held and claimed. It will hardly be contended, in the face of this, that the company paid in bonds and stock for stock that it did not, and that there was no pretense that it should acquire, whatever its power to do so. It may also be further observed that, even if this were not so and the original $25,000 of stock could be made to stand as a part of the con-

sideration for the bonds, it would not have a value of $75,000, the price paid for it, but, at the most, a bare one-third of that, after it had been "watered" and made to share with the $200,000 more which was issued, to say nothing of the $90,000 for which the property of the company was bonded.

The consideration to the company, therefore, for the $90,000 of bonds and the $200,000 of stock which were voted to Dr. Young by himself and his fellow directors, comes down to the property secured by the agreements with the Pocono and the Summit Lake Ice Companies, amounting all told to $27,500, incumbered with $10,000 of debts of the latter; and the advantages to result by the removal of competition with these and the Bear Creek Ice Company which was, of course, altogether prospective and problematical. As was to be expected, the bargain, as so made, being made with themselves, was a wholly one-sided one; the obligations of the company being voted without regard to anything but the most extravagant estimate of benefits to come. All who were interested at the time having assented, it may be that the validity of the transaction is not open to question by the company or succeeding stockholders. But the exceptants are creditors, which is quite another matter, and are not to be disposed of by the suggestion that they became such after the reorganization of the company, and so are affected by its condition as they found it; of which more presently. Neither is it of any moment that the parties who hold the bonds advanced their money on the strength of getting them. They understood, as we have seen, how this was to be brought about; $75,-000 of the money put in Dr. Young's hands being to buy the stock of Mr. Lewis and the others, which they got; $5,000 going to Stauffer and Callahan on the agreement made with them; and $10,000 being required to pay off the indebtedness of the Summit Lake Ice Company. All this was in the direct interest of Dr. Young and themselves, and not of the company, and affords them nothing to rely upon.

It is difficult to see upon this showing how the bonds in controversy, as against the exceptants, can be regarded as valid obligations of the company. By the act of assembly cited above, by which it was incorporated, the company was given power to borrow money not exceeding in amount one-half of the capital stock at the time the loan was made, and to secure the same by a bond and mortgage on its real and personal property, as well as its corporate rights and franchises. This was a restricted privilege, and, unless enlarged by subsequent legislation, its terms must be observed; the power being only exercisable in accordance with the conditions upon which it was given. No doubt there was an attempt to comply in the present instance by an increase of the capital to $225,000 which thus apparently justified the $90,000 bond issue which was voted on the strength of it. But the charter authority given to bond the property and franchises of the company in this way is for money borrowed, and nothing else, and by no liberality of construction can the transaction with Dr. Young be made to assume that character. Nor was there indeed any pretense of doing so; the bonds and stock being voted to him in return for the agreements which he was to turn over. That this was in any respect a legitimate exercise of the power given by the charter will hardly be argued. It

did not even meet the forms of the law, to say nothing of the substance.

But this, after all, is not material; the case turning on that which is much more serious. It is provided by article 16, § 7, of the state Constitution that:

"No corporation shall issue stock or bonds, except for money, labor done, or money or property actually received; and all fictitious increase of stock or indebtedness shall be void."

The same prohibition appears in the general corporation act of 1874 (Act April 29, 1874, § 17; P. L. 81), where the right to borrow money upon bond and mortgage is also restricted (section 13) to one-half the amount of the capital stock paid in, a provision which is retained in the amendment of May 21, 1889 (P. L. 257). By act of February 9, 1901 (P. L. 3), however, the capital stock or indebtedness of any corporation, one or both, may be increased with the consent of a majority in value of the stockholders to such an amount in the aggregate as shall be deemed necessary to carry on or enlarge its business and corporate purposes. This is said to have broken down the dividing wall between capital stock and corporate indebtedness previously existing. Commonwealth v. Railroad, 25 Pa. Co. Ct. Rep. 274; Id., 207 Pa. 154, 56 Atl. 409. And, as it is made in terms to apply to a corporation created by special as well as by general law, the present company would seem to be within its purview, and the bonds and stock in controversy to be valid without regard to whether the conditions prescribed by the charter were complied with, if otherwise authorized.

But the provisions of the Constitution which have been quoted, and the statute passed to enforce them, are not so easily disposed of. Their evident purpose was to prevent the creation of corporate securities which were not representative of actual value, an altogether too prevalent if not growing evil. The prohibition is comprehensive and emphatic, and, having been regarded as of sufficient importance to be made a part of the fundamental law, such a construction should be given to it as will make it effective, and no evasion is to be countenanced. But, if the transaction which is here in question will pass muster, the law might as well be abrogated. The fact is that, disguise it as we may, in no just sense were the bonds and stock which were voted to Dr. Young issued for money or property, as is so required. Not that the agreements turned over by him and the property and business thereby secured were devoid of all value. Rarely, indeed, is this the case. But the present actual value of that which they represented was comparatively so slight—there being but $27,500 of visible property for $90,000 of bonds, to say nothing of the $200,000 of stock—and the prospective value, upon which alone the transaction could be justified, was so speculative, not to say fanciful, that the obligations given in return must be regarded as colorable, and so fictitious, within the meaning of the Constitution, and therefore void. The case differs only in degree from Commonwealth v. Reading Traction Co., 204 Pa. 151, 53 Atl. 755, where the court did not hesitate to so characterize the corporate securities there involved, on the authority of which the decision here may well be made to rest. See, also,

Reed's Appeal, 122 Pa. 565, 16 Atl. 100, and Fidelity Co. v. West Penn. R. R., 138 Pa. 494, 21 Atl. 21, 21 Am. St. Rep. 911. And generally, 10 Cyc. 474, 1170, and 7 Am. & Eng. Encycl. Law (2d Ed.) 786. The parties participating may have hoped that some day their securities would approximate the figures given to them, or even have honestly believed that this would be the case. But they could not fail to have known that it was not so at the time, and it is by this that the validity of the transaction is now to be judged. Finletter v. Acetylene Light Co., 215 Pa. 86, 64 Atl. 429. Two bad ice years and other competitors coming into the field, from which they could not be kept out, pricked the bubble, and bankruptcy was all that was left. This was after the fact, of course, but it served to show how absolutely unwarranted any such expectation was, and how dangerous it would be to make mere expectation the basis of accepted value.

The bonds of the company being void by the Constitution, the right of the excepting creditors to question them cannot be doubted. Not. of course, in the hands of innocent purchasers for value. Commonwealth v. Reading Traction Co., 204 Pa. 151, 53 Atl. 755. But that is not the situation here; both bonds and stock, so far as is shown, being held by the parties who participated in their issue. Nor, as already intimated, can it be said that the exceptants came in after the bonded indebtedness of the company had been contracted, and so are not in a position to question it, being affected by conditions as so established, if that is material. The judgment of the Bear Creek Ice Company, if not that of the Albert Lewis Lumber Company, is for ice which was delivered in accordance with the agreement made by Dr. Young and adopted by the company to take a certain yearly quantity; the agreement with the company being executed March 15, 1901, the day the bond issue was voted by the directors, but before it had been finally authorized by the stockholders. The obligation, therefore, which is the basis of the indebtedness to the excepting creditors, anticipates the bonds, and is not to be postponed to them upon any supposed idea of their priority. But, aside from this, having regard to the conditions which obtain here, the rights of creditors are superior whether existing or subsequent. The bonds are mere promises to pay, and in the hands of the present holders are no more at best than voluntary obligations which cannot be enforced as against the claims of those to whom the company is actually indebted. The gift of a note or bond by the maker is not executed except by payment. Kern's Estate, 171 Pa. 55, 33 Atl. 129. And, as to all over and above the value contributed for them, the bonds of the company were a gift here. To the extent of such value, this may not be the case; and, having regard to this, and treating them not as bonds, but as representing advances made to the company by the holders—if that can be said of them—it may be that, upon general distribution, they would have the right to come in pro rata with other creditors. But, as bonds secured by a mortgage lien upon the property of the company, they are made void by the Constitution, and, being sought to be used in that capacity to satisfy the bid of the purchaser at the trustee's sale, they cannot be recognized; and, unless otherwise com-

plied with, the sale must be set aside. The referee in reaching the opposite conclusion dealt with the case as though it involved merely a question of the inadequacy or illegality of the consideration. But this is beside the mark. He also seems to have been impressed with the idea that to invalidate the bonds would be to discredit numerous other similar transactions countenanced by the business world. But this is a consideration which cannot obtain. Whatever the result, the law must be declared as it is. I venture, however, to observe that the sooner people are brought to realize and accept that neither in law nor in legitimate finance can nothing be made to stand for something the better we shall all be off.

The referee is reversed, the exceptions to the return of sale are sustained, and the sale set aside and the property directed to be resold unless the purchaser shall pay to the trustee within 10 days the sum of $38,350 remaining unpaid upon his bid. Act April 20, 1846, § 2 (P. L. 411); Bedell's Appeal, 87 Pa. 510; Fry v. Specht (Pa.) 1 Atl. 441.