## Bailey *versus* The Pittsburg and Connellsville Gas Coal and Coke Co.

1. B., H. and S. were promoters of an association under the Act of July 18th 1863, with a capital of $200,000. F. and M. united with them; afterwards, September 29th, land was purchased by B., H. and S. for $125.000. A subscription book for stock was opened about October 1st; B., H. and S. subscribed for stock, in the aggregate $50,000: the subscriptions of the others with a sixth name amounted to $133,000, which B., H. and S. certified under the act had been "paid in." The land was taken by the company; afterwards subscriptions were made by other persons. In a suit by

[Bailey *v.* Pittsburg & Connellsville Gas Coal & Coke Co.]

the company against B. for his subscription, he alleged that the company, about October 1st, had agreed to take the land at an advance of $50,000, to be paid in stock, subject to the whole purchase-money and that his interest in the land by the authority of the corporators there, was appropriated to pay his stock. The court below charged that this allegation if proved, would be no defence as against subsequent stockholders unless cognisant of the facts when they subscribed or they affirmed it afterwards. *Held* to be correct.

2. The arrangement was not a valid payment of the stock under the Act of 1863, which contemplates payment in money.

3. The Act of July 18th 1863 (Mining Corporations), examined and construed.

October 9th 1871. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Error to the Court of Common Pleas of *Allegheny county:* Of October and November Term 1870, No. 125.

This was an action of debt commenced July 3d 1869, by The Pittsburg and Connellsville Gas Coal and Coke Company against James M. Bailey, for his subscription to 150 shares of the capital stock of the plaintiffs at $100 per share. The plaintiffs were incorporated under the Act of July 18th 1863, Pamph. L. (1864) p. 1102, Purd. 1347.

On the trial, May 2d 1870, before Collier, J., the plaintiff gave in evidence:—

"The Subscription-Book of Stock—Oct. 1864.

Pittsburg and Connellsville Gas Coal and Coke Company.

Capital stock, $200,000—2000 shares, $100 each.

Directors: W. M. Faber, J. Meskimen, S. H. Hartman, J. P. Henderson and James M. Bailey.

1864. We the undersigned do hereby subscribe for the number of shares set opposite our names, of the capital stock of the 'Pittsburg and Connellsville Gas Coal and Coke Company.'"

| Names, | Number of Shares. | Amount. |
|---|---|---|
| S. H. Hartman, | 190 | |
| J. Meskimen, | 290 | |
| D. R. Davidson, | 250 | |
| James M. Bailey, | 150 | |
| Wm. M. Faber, | 290 | |
| J. P. Henderson, | 160 | |

(14 other subscribers, for 250 shares.)

The plaintiffs rested.

The defendant gave in evidence three certificates, dated November 7th 1864, to him for 50 shares each, of the capital stock of the company, and proved by J. P. Henderson, treasurer, that they had been issued in pursuance of an order of the board of directors.

On cross-examination, Henderson said: "No money was paid for this stock, it was paid in land about the time of the organization in September or October 1864;" the same land paid for sub-

[Bailey *v.* Pittsburg & Connellsville Gas Coal & Coke Co.]

scriptions of witness and S. H. Hartman, to whom certificates were issued in the same manner by order of the directors. The land had been bought from D. R. Davidson by defendant and the witness; he was the only one in the written contract; he paid no money on the land.

Being re-examined, he said: "The company went into possession of the land at the time. When the stock was subscribed, it was agreed it should be paid in land. This was the agreement of all the five stockholders of the company."

The defendant rested.

The plaintiff in rebuttal gave in evidence the certificate duly recorded November 3d 1864, of the formation of the company. It certified that the amount of the capital stock was $200,000 in shares of $100 each, that $133,000 of the stock had already been paid in; that it had been organized by the election of five directors. The certificate was signed and sworn to, October 26th 1864, by Bailey and Henderson, as president and treasurer, and also by them and S. H. Hartman as directors. This was accompanied by the proper certificate from the secretary of the Commonwealth.

They gave in evidence also the affidavit of defence made by the defendant, that he had fully paid his subscription by a sale to the plaintiffs of his interest in a tract of land bought from D. R. Davidson, which was accepted by the company as payment of his subscription, and that he owed them nothing.

Also an agreement between Davidson and Henderson dated September 29th 1864, by which Davidson agreed to convey to Henderson his farm in Connellsville township, Fayette county, for $125,000, payable $25,000 in hand, and $20,000 annually thereafter till the whole should be paid, Davidson to have the use of the surface except so much as might be necessary to carry on the coke and coal business till the first payment should be made. They gave in evidence also other agreements about the property conveyed to the company, not necessary to specify.

J. P. Henderson, called by the plaintiffs, testified that $133,000 sworn to as paid in, meant the land. Davidson never subscribed or paid anything; he was to take $25,000 as part payment for the land.

Under objection and exception the plaintiffs proved by a number of stockholders, that after the subscriptions of the defendant and his co-corporators, they had subscribed for stock and paid cash, and had never heard of the other stock having been paid in land.

J. Meskimen testified that he and Faber being in the coke business, and needing more capital, had agreed with defendants, Hartman and Henderson, after several meetings, to form a company; the property of witness and Faber to be taken by the company at a schedule price agreed on; witness and Faber to take

[Bailey *v.* Pittsburg & Connellsville Gas Coal & Coke Co.]

$58,000 in the stock. This was about October 1st, when the company took possession of their property. Faber opposed the purchase of the Davidson property. Defendant, Henderson and witness went to see Davidson, who agreed to sell it for $125,000, "and made an article that night." It was not suggested that defendant, Henderson and Hartman were to pay their subscription in the Davidson land. Witness never heard that the land was to be put in at $175,000.

They proved by Davidson that he had not signed the subscription-book, nor authorized any one to sign for him.

They gave in evidence an agreement dated October 1st 1864, between Meskimen and Faber of the one part and the plaintiffs of the other part, by which Meskimen and Faber conveyed their property to the plaintiffs, specifying it, in consideration of which the plaintiffs agreed to issue to Meskimen and Faber $58,000 of the stock of the company, and to pay a mortgage of $8490 on the property conveyed, and a note of $3000. This agreement was executed before Meskimen's and Faber's subscription to the stock was taken, the plaintiffs' company being then composed of the defendant, Henderson and Hartman.

The defendant in answer gave evidence by Henderson that the Davidson land was purchased by him for himself, Hartman and the defendant. The terms of sale to the plaintiffs were, that the company should pay to the three $175,000 for the land, of which $50,000 was to be in stock; the balance was to be assumed by the company. The agreement was made the latter part of September 1864, shortly after the agreement with Davidson. It had been filed with the company, and the witness assigned it in 1867 after he had ceased to be a member. The stockholders of the company were defendant, Hartman, Meskimen, Faber and witness; the proposition to take the Davidson farm first came from the corporators and was approved by them; after these transactions other persons became stockholders; all the directors assented to the payment of the stock in the Davidson land; the price was a fair and reasonable price.

S. H. Hartman testified substantially as Henderson, and also that he had paid nothing for the Davidson land, nor for the stock.

The defendant also testified on cross-examination, that he had never paid anything on the land or for his stock.

There was evidence in rejoinder by the plaintiffs in answer to the defendant's.

The defendant submitted points, on which he asked the court to charge, and which with their answers will be found in the assignments of error.

The verdict was for the plaintiffs for $19,975.

The defendant took a writ of error, and assigned for error:—

1. The court erred in refusing to charge as requested in de-

19 P. F. Smith—22

fendant's third point: "That as between a corporation like the plaintiffs and the individuals establishing said corporation, the latter may sell and transfer unto such company an interest in real estate, and receive in payment therefor stock of the company, provided that said sale be not induced by any fraud or misrepresentations; that, in the present instance, if the jury believe that the defendant associated himself with Meskimen, Faber, Hartman and Henderson, to form the company plaintiff; that by mutual consent, Meskimen and Faber put their property into the company at an agreed valuation, and received payment therefor in stock of the company; that the defendants, Hartman and Henderson, put their interest in the Davidson tract into the company at an agreed valuation, and received payment therefor in stock of the company; that the said five persons, to wit, Meskimen, Faber, Hartman, Henderson and the defendant composed the entire body of corporators at the time, then the jury should find for the defendant;" and in charging the jury: "Admitting the arrangement set up by the defendant, that his subscription was agreed between himself, Hartman, Henderson, Faber and Meskimen, to be considered paid by the estimated increased valuation of the land purchased from Davidson to be true, it would be no defence as against subsequent stockholders, who had paid their subscriptions to the capital stock of the company, unless they were cognisant of the transaction before they subscribed, or, after having subscribed, they affirmed it;" and in stating in answer to said third point that the same was "refused."

2. The court erred in refusing to charge as requested in defendant's fourth point, viz.: "That if the jury find that the plaintiff corporation accepted the defendant's interest in the Davidson tract as payment of his capital stock, and has continued to hold and enjoy said interest for several years, and still owns and holds the same, never having offered to reconvey to defendant, then the plaintiff cannot recover in this action, and the verdict should be for the defendant."

3. The court erred in charging: "Admitting the argument set up by defendant, that his subscription was agreed between himself, Hartman, Henderson, Faber and Meskimen, to be considered paid by the estimated increased valuation of the land purchased from Davidson to be true, it would be no defence as against subsequent stockholders, who had paid their subscriptions to the capital stock of the company in money, unless they were cognisant of the transaction before they subscribed, or, after having subscribed, they affirmed it."

*G. Shiras, Jr.,* for plaintiff in error.—The Act of July 18th 1863 does not require that stock shall be paid in money: If there was no fraud or misrepresentation the transaction was valid: Simons *v.* Vulcan Oil Co., 11 P. F. Smith 202; McElhenny's

Appeal, Id. 188 ; Ashhurst's Appeal, 10 Id. 290 ; Bissell v. S. &
N. J. Railroad Co., 22 N. J. 258. There should have been a
tender of reconveyance of the land : Pearsoll v. Chapin, 8 Wright
12.

*J. Veech*, for defendants in error.—The Act of July 18th 1863
authorizes no other mode of paying for stock than in money.
" Sect. 16. * * * No note or obligation given by a stockholder,
whether secured by pledge or otherwise, shall be considered as
payment of any part of the capital stock."
" Sect. 29. * * * No share shall be issued for less than its par
value :" Patterson v. Arnold, 9 Wright 410. An organized cor-
poration may do in relation to its stock, what the commissioners,
promoters or associators, before incorporation, cannot do : Erie &
Waterford Plank Road v. Brown, 1 Casey 157 ; Bavington v.
Pittsburg and Steubenville Railroad, 10 Id. 358 ; Pittsburg and
Connellsville Railroad v. Stewart, 5 Wright 54. The oath and
certificate of October 26th 1864 being false, was, *per se*, such a
fraud upon subsequent stockholders, as to entitle them in the name
of the company to compel payment of the stock subscribed, by
those certifiers, in cash : Henry v. Vermillion and Ashland-Rail-
road, 17 Ohio Rep. 187 ; Minor v. Mechanics' Bank, 1 Peters 65 ;
Graff v. Pittsburg and Steubenville Railroad, 7 Casey 497 ; Robin-
son v. P. and Connellsville Railroad, 8 Casey 339 ; Bedford Rail-
road v. Bowser, 12 Wright 29 ; Caldwell v. Boyd, 7 P. F. Smith
321 ; McElhenny's Appeal, Simons v. Vulcan Oil Co., *supra*.

The opinion of the court was delivered, October 23d 1871, by
AGNEW, J.—This action was brought to recover a subscription
to the stock of the company. The plaintiffs having shown that no
money was paid by Bailey when he obtained his certificate of
stock, the defendant undertook to show that the stock of himself
and Messrs. Hartman and Henderson was paid for upon an arrange-
ment by which the company took a tract of coal-land from them
at $175,000, which they had bought of D. R. Davidson at $125,000 ;
the company to pay the whole sum of $125,000 to Davidson, and
to credit them with the advance in the price, viz. : $50,000, in
payment of their stock. By this arrrangement no money was paid,
and this amount of stock represents nothing but an agreed advance
in the price of land within less than a week from the time of its
purchase. The corporation plaintiff, it is alleged, organized under
the Act of 18th July 1863, the 1st section of which requires the
formation of the association to be in writing. Whether then such a
writing was entered into does not appear, the parties having con-
tented themselves with giving in evidence only the certificate
required by the law to be made, attested and recorded. It is tes-
tified that the company was organized on the 1st day of October

1864, the subscription-book bears date October 1864, and on that day, October 1st, the company, composed of Bailey, Hartman & Henderson took into the association Faber and Meskimen, as appears by their agreement of that date, while the purchase of Henderson from Davidson at $125,000 was made only on the 29th of September 1864. It is manifest no actual rise in the value of the property had taken place, and both Faber and Meskimen testify that they did not know and did not consent to the Davidson farm being put into the company at $175,000. It also appears from the testimony of both sides that the organization of the company was in contemplation before the purchase from Davidson, that several meetings had been held in reference to the subject, and Meskimen testifies, that the purchase of the Davidson farm was discussed and was opposed by Faber, and that he himself went up with Bailey and Henderson to see Davidson, who agreed to sell at $125,000, and the article was made for it that night. It is very clear from the whole evidence that if the company did take the farm from Messrs. Henderson, Bailey and Hartman, it was at an estimate only, and that these three gentlemen in fact paid nothing for their stock. This raises the question whether such an arrangement constitutes a valid payment of stock under the Act of 18th July 1863. Upon the supposition that the arrangement was not fraudulent and was consented to by all who were then members of the company, the court was asked to instruct the jury that the arrangement was valid, and that they should find for the defendant. The court refused so to charge, and said it would be no defence as against subsequent stockholders who had paid their subscriptions, unless they were cognisant of the transaction before they subscribed, or subsequently ratified it.

We discover no error in this answer. The subscription-book of stock shows that the capital was to be $200,000, consisting of 2000 shares of $100 each, and that the stock of the five originators, Hartman, Meskimen, Bailey, Faber and Henderson, amounted to only 1080 shares, or $108,000. The recorded certificate also shows that the capital was to be $200,000, divided into shares of the par value of $100, and that but $133,000 had been then (October 26th 1864) paid in. This sum included an unauthorized and unpaid subscription in the name of D. R. Davidson. It is obvious, therefore, that the association contemplated the bringing in of other stockholders, besides the five original promoters of the scheme, to the extent of 920 shares, or $92,000. It is clearly not the case of an acceptance of land in payment of stock at an estimated value by all the parties in interest. The five promoters were then, perhaps, the only corporators or subscribers to stock, but their scheme contemplated others who were to be affected by what they did, and who were to come in under the protection of the same law which authorized the origination of the scheme

by the first promoters. It is clear, therefore, that their united consent among themselves, however binding it might be, had they been the holders of all the stock authorized by their scheme, could not affect those whom they contemplated bringing in under the authority of the law, upon which they founded themselves. Such an interpretation of the law would make it the means of perpetrating the most stupendous schemes of fraud. A few individuals, founding themselves upon a highly inflated valuation of real estate, covered up and hidden under huge handbills, magniloquent descriptions, illuminated advertisements, and paid editorials, could easily draw real capital in hard cash from the dupes too often easily misled by such means. The law contemplates, we think, a stock founded on a payment in money, and not upon estimated values or mere securities for money. All its provisions tend to this belief. Thus, the power to call in the capital, is to " assess upon each share of stock such *sums of money* as the company may think proper, not exceeding in the whole the amount at which each share was originally limited," and " no note or obligation given by the stockholder, whether secured by pledge or otherwise, shall be considered as payment of any part of the capital stock :" § 16. A security by pledge of real estate would scarcely be valid as a payment under this clause. " After *payment* of the last *instalment* of capital stock," the president and directors, with the treasurer and clerk, are bound to make out, sign and swear to a certificate " stating the amount of the capital *so fixed and paid in*," and also upon an increase of the capital " *added and paid in :*" §§ 19 and 20. These certificates must be recorded in the office for recording deeds. If certificates be not so made and recorded, the officers referred to are made liable for all debts contracted by the company after thirty days from the payment of the last instalment : § 21. And by the 31st section, provision is made for filing a certificate with the auditor-general, signed and sworn to by the same officers, before the corporation shall commence business, setting forth the corporate name and purposes of the association, the amount of the capital stock, the amount *already paid in* and the par value of the shares; and by the 29th section, " no share shall be issued for less than its *par* value." From these, and other provisions of the law not referred to, it is very plain that the legislature contemplated the organization of every such corporation upon a sound basis of actual cash capital, and intended to guard the public against unsound and illusory schemes. The material facts were to be placed of record where every one desiring to become a creditor or a stockholder could find them. But of what service will be all this precaution to either creditor or subsequent stockholder, if, instead of a " paid-in" capital, he shall find in the end that it was a mere balloon, needing only to

[Bailey *v.* Pittsburg & Connellsville Gas Coal & Coke Co.]

be pricked, to collapse and leave him penniless? It is obvious, that property bought on the 29th of September at $125,000, and put in as capital on the following 1st of October, or a few days later, at $175,000, of which not a dollar had been paid, was no payment in money, or anything else of a substantial kind. Supposing the land to be worth $125,000, the additional $50,000 was simply an added estimate, wholly illusory as to the after or incoming subscribers provided for in the first organization. It was merely a scheme to let the promoters in, without payment of anything; while those to follow should furnish the money to carry on the business. Now, without charging or even assuming any fraudulent intent on part of the gentlemen who were the original promoters of the scheme, the mode adopted by them, however honestly intended, was a manifest non-compliance with the intention of the law, and a violation of the chief safeguard provided for the protection of the public. The incoming subscribers embraced in the articles of association, and following after them, were entitled to a bonâ fide money-subscription from the first promoters, in making up the capital stock, which is the property of the entire company, and in which every subscriber, old or new, has an equal interest. The purchase of real and personal estate for the purposes of the corporation, authorized in the 30th section of the law, is the exercise of a different power by the corporation. When, by a proper subscription and payment of money, it has the possession of a capital in money, the interests of all the stockholders are motives to careful and prudent bargains, and will prevent the payment of their real cash for mere moonshine. Such will not be the case, however, where subscribers are antagonistic, and one set may obtain their stock at nominal values, while others have to pay money. Finding no error in the record,

The judgment is affirmed.