McCANDLESS, RECEIVER, *v.* FURLAUD ET AL.

No. 26.  Argued October 21, 22, 1935.—Decided November 11, 1935.

*Mr. Ralph Royall* for petitioner.

144

*Mr. Louis B. Eppstein,* with whom *Messrs. Ira W. Hirshfield* and *Louis J. Altkrug* were on the brief, for respondents.

146

148

Mr. Justice Cardozo delivered the opinion of the Court.

The suit is by a receiver of an insolvent corporation to compel its promoters and their confederates to restore illicit gains.

At the time of the challenged acts Maxime H. Furlaud was the president and principal shareholder of Furlaud & Company, Inc., a corporation now dissolved. For convenience the name Furlaud, unless qualified, will be used to designate the company. Carlos Reuter was an officer of the same corporation and a holder of a block of shares. He was named as a defendant, but was not served with process, and hence is out of the case, except in so far as his acts affect the liability of others. Kingston Corporation was a subsidiary of Furlaud and was owned and controlled by the same persons. Byron Corporation and Chaucer Corporation were closely related to Furlaud and Kingston, the wife of Maxime Furlaud being an important shareholder in Byron and the wife of Carlos Reuter an important shareholder in Chaucer.

Furlaud was known as an investment banking house, and was interested in the issue and sale of corporate securities. Particularly it was interested in a project for the formation of a company that would own and operate gas fields in Western Pennsylvania. Reuter, representing Furlaud, took options from the owners of nine separate tracts. These options, which at first were gratuitous, were acquired in the name of a subsidiary, Kingston.

Engineers were then employed to examine the fields and appraise their value. One of them, Davis, made report to his employer in February, 1930, that five of the tracts, which were afterwards acquired for about $1,300,000, had a value of about $1,700,000 at the time of the appraisal. The record permits the inference that the report was unsatisfactory to Reuter, who was hoping for a valuation that would make investment in the enterprise more attractive to the public. Accordingly the business of appraisal for the four remaining tracts was taken out of the hands of Davis and placed in charge of others. The new engineers were less conservative than their predecessor. They fixed the value of the four tracts at about $5,000,000, nearly five times the purchase price. Lands to be conveyed by Nuss for $660,000 figured in the appraisal as worth the price and a million over. A value of $850,000 was assigned to undeveloped acres which he agreed to convey for nothing. The purchase price for the nine tracts was $2,572,989; $7,000,000, or nearly that, was the appraisal for the whole. A witness for the complainant stated at the trial that the fair value of all the tracts was about $2,700,000, the cost and little more.

With the appraisals thus completed a company was organized in February, 1930, to take title to the gas fields covered by the options. This was the Duquesne Gas Corporation, now in the hands of the complainant as receiver. The options for the lands were still in the name of Kingston. Furlaud had made a payment ($45,510) to give them binding force, but title had not passed. The new company when organized had an authorized capital of 1,000 shares of no-par common stock. Furlaud subscribed for the whole issue, paying for the shares at the rate of 50 cents a share. The nominees and representatives of Furlaud were then the sole stockholders. They were also the sole directors. Provision was made after-

wards for an increase of the capital stock, but of this there will be more later.

With the options still oustanding Furlaud formed a syndicate of bankers to market the securities. The syndicate published an advertisement in a newspaper inviting subscriptions by the public to an issue of bonds and notes. There were to be $4,000,000 6% mortgage bonds (to be sold at 97½%), and $1,000,000 6½% mortgage notes (to be sold at 98%). Each circular contains the caption "purpose of issue." In the bond circular the statement is "These bonds are issued by the corporation in connection with the acquisition of properties, and to provide cash for developments, extensions and other corporate purposes." There is a like statement in the other circular as to the purpose of the notes. Investors were informed that the appraisals of the engineers covering the properties of the corporation, including working capital of $365,000, aggregate $7,038,000, the properties examined by Davis being appraised at $1,743,520, and those examined by his successors at $4,929,787. The circulars as first drafted lumped the two appraisals as if they had been the work of the two appraisers jointly. Davis objected, with the result that the appraisals became several.

In the meantime Duquesne was preparing the resolutions and agreements that would be necessary to satisfy the bankers. On March 5, 1930, the directors, still dominated by Furlaud, authorized the increase of the capital stock to 1,250,000 shares. On April 3, Furlaud subscribed for 139,000 shares at 50 cents a share. On April 7, Duquesne agreed with Kingston to take over the gas fields covered by the options as soon as Kingston got the title. The consideration was to be cash in the sum of $3,015,000 (which was $565,100 more than Kingston was expected to pay to the grantors); bonds of the par value of $1,300,-

000, part of the forthcoming issue; and 535,000 shares of no-par stock. On the same day there was an agreement between Duquesne and Furlaud whereby Furlaud agreed to take all the forthcoming mortgage notes ($1,000,000) at a price of 88%; and $2,700,000 mortgage bonds at a price of 90%. The whole issue of mortgage bonds was thus divided up between Furlaud and its subsidiary, Kingston, $2,700,000 to the one and $1,300,000 to the other. Furlaud and Kingston being one, the situation was the same in substance as if Furlaud had taken them all.

The public offering of the bonds was a spectacular success. It began on March 25. By the first week of April subscriptions of the par value of $2,350,000 were on hand, and other subscriptions were coming in from day to day. The responses made it clear that an avid and credulous public would absorb the entire issue. Furlaud could safely go ahead and exercise the options, for at the pace subscriptions were coming in the proceeds of the bonds would pay for all the gas lands and leave a handsome margin over. Even so, there was need of ingenuity to work out a plan that would synchronize the two transactions, the cashing of the subscriptions and the payment for the lands. The cash would not be paid on the subscriptions till the bonds with the deed of trust were ready for delivery, and delivery was impossible until Duquesne, the mortgagor, had title to the fields. A way had to be found for providing the money necessary to get possession of the deeds, which had been placed by the grantors in escrow with banks in Western Pennsylvania. A way had to be found also for making the proceeds of the subscriptions available as a fund that could be applied with a minimum of delay upon account of the purchase price. To those ends Maxime Furlaud made arrangements with the Central Hanover Bank & Trust Company of New York that for one day the Kingston Corporation should

have a credit with the trust company of $3,015,000, and the Furlaud Company for the same time a credit of $3,379,500. The day chosen for that purpose was April 9. The credits would be used to procure title to the lands and to supply the new corporation with a fund of working capital. The subscriptions would be used so far as possible to liquidate the credits. Precautions were taken to make certain that the credits would be applied to the expected uses and not otherwise. In the words of a witness, "the bank always had a string on the money."

The appointed day arrived. Kingston drew against the credit of $3,015,000 set up in its favor, and delivered certified checks to banks in New York with which to meet drafts drawn on those banks by the banks in Western Pennsylvania. The amount thus withdrawn was $2,449,900. On report by telephone and telegraph that the checks had been received the Pennsylvania banks released the deeds from escrow and caused them to be placed on record. Title being thereby vested in the mortgagor, the mortgage bonds were handed over to the trust company for transmission to the banking houses that had collected the subscriptions. A long queue of messengers, employed by these houses, was on hand throughout the day with checks from the subscribers for delivery against the bonds. Nearly $2,000,000 (if the defendants' figures are accepted, $1,886,330) was paid then and there upon account of the subscriptions with other payments close at hand. What was paid from these sources was turned over to Furlaud, who applied it at once toward the liquidation of the loan.

The loan had been fixed at the precise amount necessary to enable Furlaud to discharge its obligations to Duquesne. Of the credit for account of Furlaud, $2,430,000 was used to pay for $2,700,000 bonds at 90; $880,000 for $1,000,000 notes at 88; and $69,500 for 139,000 shares of stock at 50 cents a share ($3,379,500 in all). But Du-

quesne was no sooner in receipt of the money than it paid the greater part out again. Of the $3,379,500, $3,015,000 was paid back to the Trust Company to be credited to the account of Kingston. This canceled the Kingston loan, reimbursed the Trust Company for the $2,449,900 withdrawn earlier in the day to obtain title to the lands, and left $565,100 over. This balance was not kept by Kingston. It was transferred at once to Furlaud; the circuit was then complete.

Furlaud had been well assured, when it closed the title on April 9, that there would be no difficulty in disposing of every bond and note. The event justified its faith. Within a few weeks all the remaining bonds had been converted into cash. Also within a few weeks the notes had been sold in bulk for $861,097.69 to a firm of investment bankers. Even the worthless shares of stock were unloaded on the public. The shares that were to go to Kingston (535,000) and those that were to go to Furlaud (139,000) were taken in the name of Parisette, one of Furlaud's employees. Of the part belonging to Kingston, 85,000 shares were assigned to the Byron and the Chaucer companies, which sold them to the public through Bergen, a stock operator, for $850,000, $425,000 being paid to Byron and a like amount to Chaucer. What became of the other shares the record does not show.

Checks and credits have now been traced through their bewildering entanglements. None the less when the process of analysis is over, it is legitimate to forget the details, and fix our minds on the results. The situation can be simplified without obscuring its essential features. Indeed only in that way will the realities of what was done be manifest.

After all the circuits had been traveled from one company to another and back to the point of origin, what had been accomplished for Duquesne and Furlaud stood out in clear relief. Duquesne had the ownership of gas fields,

worth at cost about $2,500,000, though extravagantly appraised at many millions more. It had also $365,000 for working capital. True it had received $3,379,500, but it had paid out at once $3,015,000. The working capital was the difference ($364,500) together with $500 received for the first issue of its shares. These are the credit items that any balance sheet must show. The liabilities were the bonds and notes and the no-par shares of stock. The bonds and notes, when distributed to the public, became liens for $5,000,000, more than $2,000,000 in excess of the cost of all the assets with working capital included. The shares of stock, issued in vast quantities, had nothing of substance back of them. If cost and value were about the same, there was thus insolvency at the beginning as well as at the end, unless the proceeds of the securities were devoted to the uses of the debtor, as the circulars published in the newspaper in effect stated they would be. Nothing of the kind was done. The bonds and the notes, instead of being used by Furlaud and its allies for the benefit of Duquesne, were disposed of as their own and at a large profit to themselves. The record supports the inference that some of the shares of stock were used in the same way. The promoters and their confederates pocketed the spoils. Less than two years later the victimized company was in the hands of a receiver.

The District Judge held that the appraisal of the Duquesne assets was excessive and fraudulent. "There is little doubt," he said, "that the circulars which Furlaud & Company, Inc., issued in connection with the sale and distribution of the bonds and notes of Duquesne Gas Corporation grossly and fraudulently misrepresented the value of the property by which they were secured." He held also that by force of the statements in the circulars as to "the purpose of the issue," the proceeds of the subscriptions were chargeable with a trust for the benefit of Duquesne and the holders of its mortgage debt. He

gave judgment against Furlaud individually (the Furlaud Company was then dissolved) and also against Kingston for $1,554,779.73, with interest (a total of $1,834,640.08), which was the difference between the moneys realized by the promoters through the sale of bonds and notes ($4,492,768.73), and the amount paid to Duquesne and devoted to its proper uses ($2,937,989). He refused to give judgment against any of the defendants for the proceeds of the shares of stock. There were cross appeals to the Circuit Court of Appeals for the Second Circuit, Furlaud individually and Kingston appealing from the decree in so far as it held them accountable for the proceeds of the bonds and notes, and the receiver from so much of the decree as relieved all the defendants from liability growing out of the disposition of the shares. Upon the first hearing of the cause, the Court of Appeals declined to pass upon the merits and dismissed the bill on the ground that the appointment of the ancillary receiver was void for want of jurisdiction. 68 F. (2d) 925. This court reversed, and remanded the cause for a determination of the merits. 293 U. S. 67. Upon a second hearing in the Court of Appeals the defendants were again the victors. The court took the view that Furlaud and Kingston had acted with the knowledge and consent of Duquesne, the promoters and their agents being then the only shareholders, and that under the doctrine of *Old Dominion Copper Co.* v. *Lewisohn,* 210 U. S. 206, the corporation, its incoming shareholders and the receiver were bound by that consent, whatever remedies might be available at the suit of a defrauded creditor. 75 F. (2d) 977. A second writ of certiorari brings the case to us again.

Promoters of a corporation stand in a fiduciary relation to it to this extent at least, that they will be chargeable as trustees if they deal with it unconscionably or oppressively or in violation of a statute, unless the liability for such misconduct has been effectually released. *Dicker-*

*man* v. *Northern Trust Co.*, 176 U. S. 181, 203, 204; *Brewster* v. *Hatch*, 122 N. Y. 349, 362; 25 N. E. 505; *Erlanger* v. *New Sombrero Phosphate Co.*, 3 App. Cas. 1218, affirming 5 Ch. Div. 73; *Gluckstein* v. *Barnes*, [1900] A. C. 240; *Yeiser* v. *United States Board & Paper Co.*, 107 Fed. 340, 344. To what extent the approval of all the shareholders will relieve them of that burden is a question not susceptible of answer without considering the nature of the wrong and the interests affected. To some extent their position is akin to that of directors, though the limits of their duty are less definite and certain. Even for erring directors, however, there may at times be absolution if all the shareholders are satisfied. *Holmes* v. *Willard*, 125 N. Y. 75; 25 N. E. 1083. The interests affected by approval will shape the power to approve.

*Old Dominion Copper Co.* v. *Lewisohn* was a case where promoters made a sale to a corporation in return for shares of stock, the par value of the shares being greatly in excess of the cost to the sellers of the property conveyed. The existence of this profit was known to the shareholders, for the shares belonging to the promoters were all that had then been issued. There was no evidence that the effect of the transaction was to make the company insolvent or to work a fraud upon its creditors or to divert the assets to forbidden uses or to violate a statute. "At the time of the sale to the plaintiff . . . there was no wrong done to any one." 210 U. S. at p. 212. The grantors and their syndicate "were on both sides of the bargain, and they might issue to themselves as much stock in the corporation as they liked in exchange for their conveyance of their land." 210 U. S. at p. 212. Far from planning to defraud, "they believed in the enterprise" and "preferred to take stock at par rather than cash." 210 U. S. at p. 215. They had paid for the mines with their own money, and there were no creditors to be

affected by anything they did. In such circumstances the ruling was that incoming shareholders, subscribing for new shares, were in the plight of those ahead of them and could have no better case. *Davis* v. *Las Ovas Co.,* 227 U. S. 80, declined to extend the ruling to a case where the approval was by less than all the shareholders and without disclosure of the facts to others.

*Old Dominion Copper Co.* v. *Lewisohn* does not rule the case at hand. The effect of the promoters' conduct here was to saddle the company with liens beyond the value of its assets, mortgaged and unmortgaged. Through the diversion of the proceeds of the subscriptions to the use of Furlaud and confederates, the company became crippled and indeed insolvent at the outset of its business life. True, the findings of the District Court do not state in so many words that the company in its beginnings was insolvent as well as crippled. They do state, however, that the appraisals were grossly and fraudulently and wantonly excessive. Cost in and of itself, though far from conclusive, is still evidence of value (*Parmenter* v. *Fitzpatrick,* 135 N. Y. 190, 199; 31 N. E. 1032), especially where there is no market value in the strict or proper sense. *Sinclair Refining Co.* v. *Jenkins Petroleum Process Co.,* 289 U. S. 689, 697. In this case a witness for the complainant places a valuation upon the property in substantial correspondence with the cost. There is no opposing evidence in behalf of the defendants, and so the District Judge points out. In that state of the record, the promoters had the burden of answering and repelling the inculpatory evidence by proof that they had been true to their fiduciary duties and that their conduct had been fair and just. *Geddes* v. *Anaconda Copper Mining Co.,* 254 U. S. 590, 599; *Matter of Smith,* 95 N. Y. 516, 522; *Allen* v. *La Vaud,* 213 N. Y. 322, 326; 107 N. E. 570. The public had been invited to invest in the securities on the representation that the proceeds would be used

for the purchase of the lands and for cash capital necessary or useful for the business. In fact about three-fifths of the money was applied to the designated uses, the rest being kept for the use of the promoters. If this could be done without cutting down the value of the assets below the mortgage debt, the act would be so near to magic as to call for explanation from promoters not professing to be magicians. No word of explanation was offered at the trial or is now suggested in the briefs. In those conditions, only one legitimate inference was open to the trier of the facts, and this he must be taken to have drawn. The appraisals having been shown to be fraudulent, the one legitimate inference to be drawn from the defendants' silence was that the value of the lands was not greater than the cost, at least in any large amount. If that be so, the company was made insolvent at the outset when the proceeds of the subscriptions were devoted to the use of the promoters.

No consent of shareholders could make such conduct lawful when challenged by the receiver as the representative of creditors. If the shareholders and the directors had combined with the promoters to despoil the corporation and defeat the remedies of creditors by a gift of half the assets, the gift could have been annulled either by the creditors directly or in their behalf by a receiver. *Casey* v. *Cavaroc,* 96 U. S. 467, 489, 490; *Atlantic Trust Co.* v. *Chapman,* 208 U. S. 360, 371; *Hamor* v. *Taylor-Rice Engineering Co.,* 84 Fed. 392, 399; *American Can Co.* v. *Erie Preserving Co.,* 171 Fed. 540, 542; *Sweet* v. *Lang,* 14 F. (2d) 758, 760; *Gillet* v. *Moody,* 3 N. Y. 479; *Pittsburg Carbon Co.* v. *McMillin,* 119 N. Y. 46, 53; 23 N. E. 530. The distinction between such a situation and the present is one solely of degree. This is not a case where at the time of issuing the securities the shareholders and the promoters were the only ones concerned. Here at the moment of the conveyance the interests of bond-

holders and noteholders were put in jeopardy by a diversion of the proceeds that would make their mortgage worthless. The promoters could not receive for themselves or deliver to subscribers the bonds and notes of the company secured by deed of trust until title had been acquired to the lands covered by the deed. On the other hand, they could not pay the purchase price and acquire title to the lands without the proceeds of subscriptions, the contributions of the public. All this was known to the shareholders and known to the directors, for the promoters were the shareholders and the directors men of straw. In its effect upon subscribers the transaction was the same as if the proceeds of the bonds and notes had been paid into the treasury of the company and then paid out to the directors for the use of their confederates. It was not within the power of the shareholders to legalize this waste to the detriment of others. It would not have been within their power to bring that result to pass though shareholders and promoters had been different persons, acting at arm's length. Still more clearly it was not within their power when shareholders and promoters were in substance the same persons. Cf. *California-Calaveras Mining Co.* v. *Walls,* 170 Cal. 285, 299; 149 Pac. 595; *Pittsburg Mining Co.* v. *Spooner,* 74 Wis. 307; 42 N. W. 259. Consent in such conditions, so far as it gives approval to conduct in fraud of the rights of others, is a word and nothing more. It is not in concord with realities. There is no occasion to consider whether the corporation itself at the instance of new shareholders would be permitted to disaffirm the fraud and maintain a suit in equity for appropriate relief. We put that question by. Enough that the receiver has the requisite capacity. A court of equity has taken hold of the assets of this company, intangible assets as well as tangible, for administration as a trust in accordance with equitable principles. *Hollins* v. *Brierfield Coal & Iron Co.,* 150 U. S. 371, 380.

Included in those assets are moneys fraudulently diverted to the prejudice of creditors. Cf. *McClure* v. *Law,* 161 N. Y. 78; 55 N. E. 388; *Bosworth* v. *Allen,* 168 N. Y. 157, 166; 61 N. E. 163. There is power at the instance of the receiver to bring them back into the trust.

These considerations without more would separate *Old Dominion Copper Co.* v. *Lewisohn* from the case before us now. Other aspects of the present case accentuate the division. What was done by the promoters here was in the teeth of a prohibition of the Constitution of Pennsylvania, the state where the corporation was formed and where its business was to be done. The Constitution of Pennsylvania provides (Art. 16, § 7): ". . . no corporation shall issue stocks or bonds except for money, labor done, or money or property actually received; and all fictitious increase of stock or indebtedness shall be void." See also Act of April 17, 1876, P. L. 30, 32, § 4; Purdon's Penna. Stats., Title 15, § 131. The prohibition is not escaped through the receipt of some property or money if the amount or value is inadequate. *Big Spring Electric Co.* v. *Kitzmiller,* 268 Pa. 34, 38; 110 Atl. 783; *Commonwealth* v. *Reading Traction Co.,* 204 Pa. 151; 53 Atl. 755; *In re Wyoming Valley Ice Co.,* 153 Fed. 787, 793; affirmed *sub nom. Wiegand* v. *Albert Lewis Lumber & Mfg. Co.,* 158 Fed. 608, 610. True, the securities are valid in the hands of innocent purchasers, whatever the consideration (*Guarantee T. & T. Co.* v. *Dilworth Coal Co.,* 235 Pa. 594; 84 Atl. 516), but the liability of the directors or other fiduciaries who have put them into circulation is not thereby released. There are decisions in Pennsylvania that the Constitution is not self-executing. *Grange National Bank* v. *Collman,* 306 Pa. 200; 159 Atl. 26. That holding is irrelevant as to corporations such as this one, for there exists as to them an "implementing" statute (Purdon's Penna. Stats., *supra*), without restriction as to the form of remedy. Precedents exist for a

suit at the instance of incoming shareholders, though the corporation was solvent and there was no injury to creditors. *Spangler Brewing Co.* v. *McHenry*, 242 Pa. 522, at p. 530; 89 Atl. 665. Precedents exist in cases of insolvency for a suit by a trustee as the representative of creditors, and this though they became such after the securities were issued. *Bingaman* v. *Commonwealth Trust Co.*, 15 F. (2d) 119 (D. C. M. D. Pennsylvania), and cases there collected; cf. *Coleman* v. *Tepel*, 230 Fed. 63, 70 (C. C. A. 3), affirming 229 Fed. 300; *In re Wyoming Valley Ice Co.*, *supra; Krebs* v. *Oberrender*, 274 Pa. 154; 118 Atl. 19; *Finletter* v. *Acetylene Light Co.*, 215 Pa. 86; 64 Atl. 429. Nowhere is it held that delinquent fiduciaries who have nullified the statute may keep the profits for themselves when creditors will be injured unless the profits are returned. At times and for certain purposes the consent of shareholders may give validity to acts that would otherwise be voidable, if the only interests affected are those of the shareholders consenting. It can never be operative to the prejudice of others where consent is in derogation of the public policy of the state or the prohibition of a statute. *Central Transportation Co.* v. *Pullman's Car Co.*, 139 U. S. 24, 59, 60; *Kent* v. *Quicksilver Mining Co.*, 78 N. Y. 159, 185, 186, 187; *Sheldon H. B. Co.* v. *Eickemeyer H. B. M. Co.*, 90 N. Y. 607, 613; *Mann* v. *Edinburgh Northern Tramways Co.* [House of Lords], 68 L. T. (N. S.) 96; *Society of Practical Knowledge* v. *Abbott*, 2 Beav. 559, 568. This case is plainly within the scope of that exception. There was here a statutory prohibition, rooted in public policy. *Gearhart* v. *Standard Steel Car Co.*, 223 Pa. 385, 389; 72 Atl. 699. The shareholders were not at liberty, at all events to the prejudice of creditors or other shareholders, present or prospective, to set that policy at naught. If the effect of what they did was to put illicit profits in the pockets of trustees,

their consent will not avail to block pursuit and reclamation.

We have assumed in all this that the corporation was insolvent at the beginning of its business life. The assumption is well founded for reasons already stated, yet we do not need to go so far. Even though the company was not literally insolvent, the result would be the same. There would be a wrong to bondholders and noteholders if assets were depleted to the very brink of insolvency after fraudulent misrepresentations to the effect that there was an ample margin of security. What was taken out of the company in such circumstances would be taken subject to a trust and would so continue until the security thus depleted had paid the debt in full. The defendants do not assert that it is adequate for that today. Confusion of thought is inevitable unless the position of the wrongdoers as trustees is steadily kept in mind. What is here is something more than a tort of fraudulent representations to be redressed by the recovery of damages at the suit of the defrauded creditors. What is here is a tort growing out of the fraudulent depletion of the assets by men chargeable as trustees if they have failed to act with honor. There are important differences, moreover, between an overissue of stock, which may leave the assets unimpaired, and a withdrawal of cash, which puts the enterprise in peril. Cf. *Arnold* v. *Searing,* 78 N. J. Eq. 146, 162; 78 Atl. 762; *id.,* 73 N. J. Eq. 262, 265, 266; 67 Atl. 831; *Eureka Mining Co.* v. *Lively,* 59 Wash. 550; 110 Pac. 425. The duty of reclaiming assets so diverted and holding the wrongdoers to their duty as trustees is one that rests on the receiver. It is not within the power of wrongdoers and shareholders by any compact between themselves to make the duty less.

In considering the effect of *Old Dominion Copper Co.* v. *Lewisohn,* we have spoken until now of the bonds and

notes only. It is necessary at this point to say something about the stock. Of the total issue, 535,000 shares went to Kingston as a bonus. The only pretense of value was a conveyance of the gas fields covered by the options, which were worth, as we have seen, no more than Kingston paid for them. In return for the conveyance of these lands Kingston received $3,015,000 in cash or more than the actual value of anything conveyed. It also received bonds of the par value of $1,300,000; and last of all the stock. Plainly the stock was a bonus and nothing else.

Furlaud and Kingston, having made themselves parties to a scheme whereby Duquesne was to be despoiled and its creditors were to be defrauded, became accountable, we think, for everything that came to them as a result of the conspiracy in excess of the consideration furnished on their side. They were not trustees as to the bonds and notes, and lawful owners of the shares, but trustees as to all, the transaction being a unit, infected with a common vice. Everything of profit arising out of the abused relation must now be yielded up. Even after this is done, reparation will be incomplete. Restitution of the profits will not make up, without more, for the inadequacy of the overvalued land to return to the lienors their principal and interest. In such circumstances the shares like the bonds and notes must contribute what they can. The certificates, were they on hand, might be turned into the treasury of the company for sale, if they still had any value. The shares having been sold to others and the certificates being no longer subject to the mandate of the court, the trust that attached to them has been transferred to the proceeds, which when paid to the receiver will be used like other assets in reduction of the debts.

We are not unmindful of the contention that the sale by Kingston was at the rate of 50 cents a share (which for 85,000 shares would amount to $42,500), and that the sale for $850,000 was made by two other corporations, the

Byron and the Chaucer. In view of the initial fraud the burden was on Kingston and Furlaud to show that Byron and Chaucer were purchasers in due course, and not agents and confederates wearing the cloak of purchasers. *King* v. *Doane,* 139 U. S. 166, 173; *Canajoharie National Bank* v. *Diefendorf,* 123 N. Y. 191, 204, 205; 25 N. E. 402; *Seymour* v. *McKinstry,* 106 N. Y. 230, 240; 12 N. E. 348. We think that Byron and Chaucer were subject to an equal burden. Many suspicious circumstances point to guilty knowledge and justify a holding that the burden has not been borne.

The respondents make the point that Maxime Furlaud is not subject to personal liability for wrongs committed by the Furlaud Company or Kingston. He was the head and front of the conspiracy. For anything done in fulfilment of the common purpose either by himself or by any of the corporations dominated by him, he and his confederates are liable *in solido*. *Mack* v. *Latta,* 178 N. Y. 525, 532; 71 N. E. 97; *Anderson* v. *Daley,* 38 App. Div. 505; 50 N. Y. S. 511; *id.,* 159 N. Y. 146; 53 N. E. 753; *Irving Trust Co.* v. *Deutsch,* 73 F. (2d) 121, 123; *Jackson* v. *Smith,* 254 U. S. 586, 589.

The objection is also made that testimony as to the value of the lands should have been excluded by the court as not within the pleadings. The complaint was based upon the theory that the promoters had been guilty of unconscionable conduct. Whether that was so could not be known without exploring the transaction to the depths and all the circumstances attending it. To this it may be added that the trial judge received the testimony provisionally and subject to a motion to strike when all the evidence was in. The motion was not made. Nor at any stage of the trial was there a motion to dismiss on the ground of a variance between the pleading and the proof.

Another objection is that the defendants should have been credited with expenses for commissions, attorneys'

fees, printing disbursements and the like, expenses incidental, it is claimed, to the acquisition of the lands. A fund of $300,000 was set aside for that purpose. The record makes it clear, however, that only a part of this fund was necessary for expenses of any kind and that only a small part of the expenses, if any, were of such a nature as to be permissible deductions for parties to a fraud. It is likely that some items would be allowable, if properly identified. *Loos* v. *Wilkinson,* 113 N. Y. 485, 499; 21 N. E. 392; *Frank* v. *Von Bayer,* 236 N. Y. 473, 477, 478; 141 N. E. 920; *Randolph* v. *Scruggs,* 190 U. S. 533, 539. The difficulty is that we are unable on this record to determine their amount. The judge might have required the defendants to separate the good from the bad while the case was still on trial. Instead of doing this he put the defendants off their guard by saying that matters of that sort would be reserved for an accounting. Unless the receiver and the defendants find it possible to agree as to the allowance for expenses, an accounting will be necessary to determine what part of the $300,000, the total amount reserved, is an appropriate deduction.

Other objections put forward in argument at the bar can be dismissed in a few words.

If and when the defendants shall restore to the receiver the moneys taken unto themselves, it will be time enough to consider problems as to the marshalling of assets between creditors who were such at the commission of the wrong and those of later date. No attempt is made to forecast the answer now. The principles that govern the distribution of assets conveyed in fraud of creditors, present or prospective, and after such conveyance reclaimed by a receiver, are adequate to work out justice, however great the complications.

We find it immaterial that the defendants or some of them may be liable to creditors in common law actions to recover damages for false representations as to the value of the assets. That is not the basis of the suit before us now. Moreover, the question is not here whether restitution of illicit profits as the outcome of this suit may be proved to mitigate the damages in actions by other plaintiffs, if any such there are. As we have striven to make clear, the receiver does not claim to have succeeded to the rights of bondholders or noteholders to recover damages for deceit. The wrong that is here redressed is the unlawful depletion of the assets whereby the company was made insolvent and the creditors were defrauded of their lawful rights and remedies.

The decree of the Circuit Court of Appeals reversing the decree of the District Court and dismissing the bill of complaint is reversed.

The decree of the District Court is modified by increasing the recovery against the defendants Maxime H. Furlaud and the Kingston Corporation in the sum of $850,000 with interest from June 6, 1930, when the shares of stock were sold, and by the award of judgment against the Byron Corporation in the sum of $425,000 with interest from June 6, 1930, and against the Chaucer Corporation for the same amount.

There will be a further modification by the allowance to the defendants Furlaud and the Kingston Corporation of so much of the sum of $300,000 as may be found on an accounting to have been disbursed for expenses that are chargeable in equity to the Duquesne Corporation, unless the amount of such allowance is fixed by agreement, approved by the court to which the receiver is accountable, in which event the judgment against those defendants shall be reduced accordingly.

The decree of the District Court as thus modified is affirmed.

*Reversed.*

Mr. Justice Roberts, dissenting.

I think that the decree of the Circuit Court of Appeals should be affirmed. I concur in the view that the promoters of Duquesne Gas Corporation took an unconscionable profit which they reaped at the expense of a credulous and avid purchasing public. This fact, however much it may invite animadversion, ought not to induce the courts to disregard settled principles in an effort to deprive the respondents of the fruits of their scheme.

An examination of the pleadings and the facts found leads me to the conclusion that the receiver of the corporation is without standing to recover from the promoters.

The bill recites in somewhat different sequence the facts which are set out in the opinion of the court. It does not state that the properties were not worth the amount in bonds, stocks, and cash which the Duquesne corporation paid for them. It fails to allege any fraudulent misrepresentation on the part of the respondents to purchasers of bonds or stock of the corporation. The allegation is made that Furlaud & Company, Inc. was, in the sale of the securities, a house of issue, meaning, of course, that it purchased the securities and resold them for its own account. Although the facts pleaded demonstrate that for some time after the organization of the Duquesne Corporation and the issuance of its bonds and stock Furlaud & Company, Inc., by itself and its subsidiaries, was the owner of every share of stock and every bond issued and outstanding, the bill asseverates, first, that the profit obtained on the sales of securities was a secret profit for which Furlaud and associates are accountable to the receiver and, secondly, that they stood in a fiduciary relation to Duquesne and " caused all the pro-

ceeds of the sale of the bonds and notes in excess of $2,937,989, plus legitimate expenses, to be diverted from the Duquesne Corporation for whose use and benefit the proceeds of the sale of said bonds and notes were intended and defendants Furlaud and Reuter fraudulently misappropriated said moneys to their own use." The last assertion is the nearest approach to an allegation of agency or trust for or on behalf of the corporation. The prayer is for an accounting by the defendants of the moneys received by them, apparently on the theory that such moneys were received as agents for the corporation. On its face the pleading is self-contradictory. If what the defendants took constituted promoters' profits the bill discloses that these were not secret profits taken to the disadvantage of innocent stockholders who had been brought into the corporation. Furlaud & Company and the other defendants were on both sides of the transaction and cannot be said to have deceived themselves as stockholders and bondholders and, upon familiar principles, those who took title to stock or bonds through them cannot assert rights higher than theirs. If, on the other hand, Furlaud & Company was a house of issue, dealing on its own account, it cannot have been an agent of Duquesne for the sale of bonds and stock.

The District Court denied a motion to make the pleading more specific and certain and the cause went to trial on the bill and answers. The proofs disclosed in detail the mechanics of the transaction whereby the promoters, at an expenditure of something in excess of $3,000,000, acquired $4,000,000 par value of first mortgage bonds, $1,000,000 of secured notes, and 675,000 shares of no-par common stock. Evidence was offered to prove that, at the date of the transfer, the property acquired was worth not to exceed $2,700,000. The defendants objected to this evidence on the ground that it was unsupported by any allegation in the bill. The court, nevertheless, received the proof and relied upon it for certain conclusions.

There was also evidence that in the bond circulars issued by the defendants as a house of issue, and by a syndicate of bankers formed by the defendants to sell the securities to the public, these statements were made: that the properties had been appraised at something over $7,000,000 and that the bonds and notes were issued by the corporation " in connection with the acquisition of properties and to provide cash for developments, extensions and other corporate purposes." The proofs conclusively show, and it is not disputed, that Furlaud & Company, upon its individual credit and that of its subsidiary, the Kingston Corporation, obtained the funds with which to make settlement for the bonds, notes, and stock with the Duquesne Corporation and reimbursed themselves for these loans out of moneys paid by brokers in the purchase of the securities.

It is quite true that Furlaud & Company, Inc. had, prior to receipt of the bonds, notes and stock, arranged for the sale of the bulk of the bonds to brokerage houses when, if, and as issued. This, however, is not an uncommon method of dealing and in itself is insignificant so far as the fairness or unfairness of the transaction goes.

In its final analysis the situation comes, as the District Court indicated, to this: that Furlaud & Company, Inc. advanced the purchase money for the gas properties, contributed $364,500 to Duquesne as working capital and in return received the securities. The court added that if without the circuity here resorted to Furlaud & Company, Inc. had thus bought the securities direct at an inordinately low price they could have done with them as they pleased. It held that they could not do with them as they pleased because of the method of settlement with the corporation to which they resorted. There is no specific finding by the District Court of fraud or misrepresentation on the part of Furlaud & Company, Inc., in the sale of the bonds. What is said is that the circulars misrepre-

sented the facts. There is no finding that any present bondholder relied on any misrepresentation. Although it is insisted that Duquesne was insolvent from the moment of the settlement with Furlaud & Company, Inc. there is no finding to that effect. The District Court held that the promoters stood in a fiduciary relation to the corporation. It made no finding that the purchasers of bonds and notes were induced to purchase by misrepresentation; made no finding of loss or damage to such purchasers; made no finding that the purchasers understood Furlaud & Company, Inc. were acting as agents for Duquesne in the sale of its securities; but reached the conclusion, without any evidence to support it, that those who purchased bonds and notes from the promoters understood that the money which they paid in the purchase of the securities was to go *in solido* into the treasury of Duquesne. A moment's reflection will show that this could not have been the case. The very circulars which were issued, and on which the bonds were sold, showed that they were not being sold for par and that commissions were being paid for their sale. It is quite evident from the circulars that these commissions were not being paid by Duquesne but by the brokers who were selling the bonds as principals.

Upon principle, and upon authority, the corporation had no cause of action in the circumstances against the promoters and the receiver's rights could rise no higher.

*First.* The District Court held, and the Circuit Court of Appeals concurred, that the promoters were not answerable in respect of the no par value common stock issued to them and thereafter sold by them. This Court reverses the holding and makes them liable to account for all they received for the stock. This is in the teeth of *Old Dominion Copper Co.* v. *Lewisohn,* 210 U. S. 206. There, as here, stock was issued for property. The claim was that the property was worth vastly less than the par of

the stock issued for it. Additional shares were later subscribed for by the public. This Court, in a unanimous opinion, speaking by Mr. Justice Holmes, held that any wrong which had been done to the innocent subscribers could not be redressed in an action by the corporation. Here we have a much stronger case, for all the stock was subscribed for and taken by the promoters. There were no innocent subscribers. In such a situation the courts with practical unanimity hold that the corporation has no right of action.[1]

*Second.* On its face the transaction under investigation amounted to this and nothing more: The promoters paid themselves an exorbitant price in bonds, notes, stock, and cash for property which they turned over to the corporation they had promoted. The bonds and notes thus acquired they sold in the open market and as principals. If in such sale they misrepresented the value of the security they are liable to those whom they deceived. This is not denied. It was stated at the bar that numerous actions had been brought against them on this basis. Although purporting to be purchasers of securities and sellers of the same in turn for their own account, they are now converted into trustees for the corporation which corporation they were in essence at the time of the transaction and which corporation had, therefore, full and complete knowledge of every factor in the transaction. This again is in the teeth of *Old Dominion Copper Co.* v. *Lewisohn, supra.*

In support of its holding the court cites *Dickerman* v. *Northern Trust Co.,* 176 U. S. 181; *Brewster* v. *Hatch,* 122 N. Y. 349; 25 N. E. 505; *Erlanger* v. *New Sombrero Phosphate Co.,* 3 App. Cas. 1218; *Gluckstein* v. *Barnes* [1900] A. C. 240; and *Yeiser* v. *United States Board &*

---

[1] See the authorities collected in the annotation to *Hays* v. *The Georgian, Inc.* (280 Mass. 10; 181 N. E. 765) 85 A. L. R. 1263–1265.

*Paper Co.,* 107 Fed. 340. An examination of the opinion in the *Old Dominion Copper Company* case will show that it was there said the relevant observations in the *Dickerman* case were *obiter* and could not control the case in hand; that the *New Sombrero Phosphate* case and the *Gluckstein* case were distinguishable, as was the *Yeiser* case, the latter on the ground that the transaction was carried through after innocent subscribers had paid for stock; and that *Blum* v. *Whitney,* 185 N. Y. 232; 77 N. E. 1159, (a later case than the New York case relied upon by the majority) was properly cited in support of this court's decision. The facts just stated clearly indicate that the decision now made in effect overrules the *Old Dominion* case. The so called fiduciary relation of promoters may be availed of by the corporation only in virtue of the equity of innocent stockholders defrauded by the promoters' scheme. So holds the *Old Dominion* case, and so hold many authorities which are in accord. It is said that the right of the corporation to pursue the promoters depends upon the circumstances under which the stockholders gave their consent to the transaction involved in the promoters' scheme. Nothing is disclosed in the opinion of the court to differentiate this case from the *Old Dominion* case save that, as asserted, but not found below, the transaction caused insolvency to the Duquesne Corporation and the suit is here brought by a receiver.

*Third.* It is of course true that a receiver represents creditors and stockholders; but the proposition is true only in the sense that what he recovers as assets of his corporation is dedicated first to the payment of creditors and afterwards to the liquidation of outstanding shares. It has never been doubted that his right of action for a fraud committed upon the corporation by a third person is no greater than and no different from that available to the corporation. It is a novel doctrine that, if individual creditors have at the date of the receivership their own

causes of action against third parties for fraud or misrepresentation, upon the appointment of a receiver these causes of action are assigned in law to the receiver. We know of no authority for such a proposition and none is cited in the opinion of the court. Courts which have considered the question have decided against the right of a receiver to maintain a suit such as this one.[2]

The opinion goes further, and holds not only that these individual causes of action may be grouped in the receiver, but that he as assignee is not subject to the rules as to allegation and proof by which the bondholder would be bound in an action for fraud, misrepresentation or deceit. This is to confuse separate causes of action fundamentally differing both in their substance and in their incidents. Any amount recovered by the receiver in this action will go into the corporate treasury and be distributed therefrom to the creditors of the corporation. It appears from the record that the bondholders have brought a foreclosure suit upon their mortgage. They will in that action first avail themselves of the security pledged under the mortgage. They will become general creditors as to any amount by which their security is deficient. The record does not inform us how many such general creditors,— sellers of merchandise, lenders on unsecured paper, or employees and the like,—there are. Certainly these have no equity and no vestige of claim against the promoters arising out of the promotion of the Duquesne Corporation. And yet a recovery here will inure to their benefit as well as to that of the bondholders. If, as is said, the receiver represents the bondholders, shall the obtaining of a decree in this action operate as *res judicata* in the other actions brought by bondholders and now pending? The opinion

[2] *Tompkins* v. *Sperry, Jones & Co.*, 96 Md. 560; 54 Atl. 254; *Bostwick* v. *Young,* 118 App. Div. 490, 496; 103 N. Y. S. 607, affirmed 194 N. Y. 516; 87 N. E. 1115; *Young* v. *Stevenson*, 180 Ill. 608; 54 N. E. 562.

does not answer the question. It seems clear that a suit by the receiver must be in the right of the corporation, and that the most he can claim is what the corporation could claim, namely, a derivative right of suit based upon fraud perpetrated upon innocent shareholders who were such at the time of the consummation of the scheme. Upon the facts pleaded and proved there can be no such derivative right in this case.

*Fourth.* We are told that the action may be maintained by the petitioner in virtue of the fact that the transaction was forbidden by a provision of the Constitution of Pennsylvania, and a statute passed to implement it, voiding all fictitious increases of capital stock or indebtedness of corporations and forbidding the issuance of stocks or bonds except for work and labor done or money or property actually received. The point was apparently not made or considered below. It cannot avail the petitioner.

The constitutional provision is not self-executing.[3] There is nothing in the law of Pennsylvania justifying a suit by a receiver in circumstances such as here disclosed to recover for the corporation alleged illicit profits; and the Supreme Court of the Commonwealth has clearly indicated that such a bill will not lie by the corporation to recover for promoters' profits or alleged fraud in issuing stock at an overvaluation for property where, as here, all the stockholders approved the transaction.[4]

As we have above pointed out, the receiver's rights can in no way differ from those of the corporation. This

---

[3] *Yetter* v. *Delaware Valley R. Co.,* 206 Pa. 485; 56 Atl. 57; *Grange National Bank* v. *Collman,* 306 Pa. 200; 159 Atl. 26.

[4] *Spangler Brewing Co.* v. *McHenry,* 242 Pa. 522, 529; 89 Atl. 665. See also *Wood* v. *Corry Water-Works Co.,* 44 Fed. 146 (*U. S. C. C. W. D. Pa.*). In contrast, see *McElhenny's Appeal,* 61 Pa. 188; *Densmore Oil Co.* v. *Densmore,* 64 Pa. 43; *Bailey* v. *Pittsburg & Connellsville Co.,* 69 Pa. 334, where there were innocent subscribers for shares, who were ignorant of the profits taken by the promoters.

Court ought not to create a trusteeship upon an assumption of a State policy which is not recognized by the courts of the State.

The decree of the Circuit Court of Appeals should be affirmed.

MR. JUSTICE MCREYNOLDS, MR. JUSTICE SUTHERLAND, and MR. JUSTICE BUTLER concur in this opinion.