**USACO COAL COMPANY, et al., Plaintiffs,**

v.

**CARBOMIN ENERGY, INC., et al., Defendants.**

Civ. A. No. C 81–0017 L(A).

United States District Court,
W. D. Kentucky,
Louisville Division.

Feb. 5, 1982.

Richard A. Getty, James R. Cox, Lisabeth Hughes, Greenebaum, Doll & McDonald, Louisville, Ky., for plaintiffs.

Joseph J. Golden, Louisville, Ky., for Westport and Worden.

Bert T. Combs, Sheryl G. Snyder, M. Stephen Pitt, Wyatt, Tarrant & Combs, Louisville, Ky., for Carbomin, Columbia and Schierack.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALLEN, Chief Judge.

This action is submitted to the Court on the motion of the defendants, with the exception of William Worden, to dissolve the temporary restraining order previously entered, and upon the motion of the plaintiffs for a preliminary injunction. Some 17 days were consumed in hearing evidence presented by the plaintiffs, a rather unique development in the hearing of evidence upon a motion for a preliminary injunction.

Plaintiffs brought Count I of the action under what is known as the "Racketeer Influenced and Corrupt Organizations" (RICO) statute, 18 U.S.C.Sec. 1961 et seq., alleging that defendants entered into a conspiracy to defraud plaintiffs, and that acts were done in furtherance of the conspiracy which constituted violations of the Act. Damages were asked for in the principal amount of $8,300,000 and treble damages of $24,900,000 were demanded under RICO, 18 U.S.C.Sec. 1964(c), and punitive damages in the amount of $1,000,000 were requested.

In addition, plaintiff, in Count II, alleged a breach of fiduciary duties by the defendants, in Count III alleged common law fraud, and in Count IV alleged breach of contract.

The evidence reflects that Axel Rossbach, the moving party on behalf of the plaintiffs, is a man of some 33 years of age, who has degrees in economics and business administration received in 1973 and 1975 in Germany. His specialty lies in attracting clients to invest their money in Germany in enterprises which he believes will be profitable for them. Pursuant to the German method of doing business, Rossbach would receive commissions or fees from the person who owns the real estate or project in which Rossbach's clients are to invest their

funds. There is no fixed set of fees and they vary from situation to situation.

Plaintiff USACO Coal Company is a Kentucky limited partnership. The general partner in USACO-Kentucky is USACO Coal Corporation, a Kentucky corporation and the limited partner is the plaintiff USACO Kohleforderrungs GmbH & Company. Handels KG (USACO–Germany) is a German entity similar to an American limited partnership.

Rossbach, who is a German citizen, is now the sole stockholder of Multirent, which is the sole stockholder of USACO GmbH. Multirent is a German corporation that was set up at the request of defendant Horst Schierack. Rossbach owned 50% of its shares when it was incorporated in 1978, Schierack owned 25% and Lampart and Meier, who are tax advisers, owned 12½% each. Its function was to sell the shares of USACO. It was to receive a commission for its sale of shares.

Rossbach was designated as president of USACO Coal Corporation and president of USACO GmbH, pursuant to discussions between himself and defendant Schierack, as well as Lampart and Meier.

Defendant Carbomin is a Delaware Corporation authorized to do business in Kentucky, and defendants Columbia and Westport are Kentucky corporations.

Defendant Schierack is a citizen of West Germany. He is the owner of 60% of the stock of Schierack Gas KG, (Schierack Gas) which owns 100% of the stock of Carbomin. He is a design and project engineer who has been primarily engaged in the building and design of liquified gas plants and gas tankers. He has controlling interest in Liquid Gas International GmbH (LGI). Schierack, through Schierack Gas and H. S. Investitions, owns approximately 20% of the shares of USACO–Germany and is the largest single stockholder in plaintiff USACO.

Defendant Bill L. Worden is a resident of Indiana, who owns fifty percent of the stock of Westport and was the original incorporator of Columbia.

In the fall of 1977, Schierack, after having previously met with Worden, began discussing a coal investment in Kentucky with Rossbach. In April, 1978, Schierack and a German investor named Enno Poets, and two brothers named Eichenauer, incorporated Carbomin with a capital of $1,000,000. Schierack, Poets and the two Eichenauers each held one-third of the shares. In 1980, Schierack purchased the shares of Poets and the Eichenauers for $1,300,000.

In April, 1978, Columbia, which was then owned by Worden's family, purchased a tipple site in Letcher County, Kentucky for $150,000. Schierack Gas then purchased the site from Columbia in the same month and resold it to USACO on May 20, 1978 for $360,000, or a profit of $210,000. Rossbach made no attempts to find out what price Schierack Gas had paid for the site, nor was any mention made by Schierack or Schierack Gas to Rossbach or USACO as to what amount had been paid for the site.

The funds which USACO used to purchase the tipple site were borrowed from Schneider & Muenzing Bank, with guarantees given to the Bank by the incorporators of Carbomin that USACO would repay the loan.

After the sale of Columbia stock to Schierack for $1,200, Columbia purchased 800 acres in Letcher County containing coal reserves for approximately $1,500,000.

In June, 1978, Schierack retained Comis Tyler to conduct a coal reserve study as to the Letcher County reserves. He caused some core drilling to be conducted and various laboratory tests to be performed, and then rendered an opinion in July, 1978 that coal reserves in the amount of approximately 10.8 million tons were in place on the property. Tyler's research and findings were discussed with Schierack, as well as Rossbach and Worden, and each of those persons had visited the mines as well as the Letcher County properties.

After Tyler's report was received, Paul F. Bennett was retained to estimate the amount of coal recoverable from the Letcher County property and he made a written report dated August 31, 1978 stating that

approximately 6.5 million tons of coal were recoverable from the property. Rossbach was given a copy of that report. After the litigation started, USACO retained an expert, John W. Sabo, who testified that there were coal reserves of approximately 5.8 million tons with a potential of 3.5 million being recoverable.

On November 2, 1978 USACO entered into a coal mining lease with Carbomin dated October 31, 1978 regarding the Letcher County coal reserves. That lease required USACO to make an advance non-recoupable lease payment of $2,812,000 and to pay a per ton royalty of $3.75, and to make annual payments of $1,875,000 based on the assumption that there would be mined and sold at least 500,000 tons of coal per year.

In order to secure investors, USACO–Germany, during the summer of 1978, prepared a prospectus containing certain information and representations by USACO. Certain portions of the prospectus were drafted by LGI and/or Heidi Ratti, now Mrs. Schierack. The prospectus contained the opinions and information from the Tyler and Bennett reports as to the coal in place and recoverable tonnage, and referred to an anticipated tax shelter rate of 97%. The prospectus was edited by Rossbach and he was fully familiar with all of its provisions.

While Rossbach was the president of the USACO entities in Kentucky and in Germany, it appears from the weight of the evidence that the great part of the conduct of business of the Kentucky entities was carried out by Schierack and Bill Worden. Worden, a resident of Indiana, was employed by Schierack and had a contract with USACO which guaranteed him $125,000 for performance of his managerial duties. He also had been informed by Schierack by letter dated September 14, 1978 on Columbia letterhead that he would receive 25 cents for each short ton of coal mined and removed by USACO under the Carbomin lease.

Prior to the execution of the lease between Carbomin and USACO, Schierack had presented Rossbach with an appraisal report of Letcher County properties which were stated to be worth $3,900,000. As mentioned earlier, Columbia, which Schierack had purchased for $1,200 from Worden, paid a total of $1,200,000 for these properties and, in turn, sold them to Carbomin for $2,200,000.

It was contemplated by Schierack and Rossbach that Rossbach was to oversee the sale of stock in USACO–Germany to investors in Germany. The agreement was that Rossbach would obtain a total of 14,000,000 deutsche marks, hereinafter referred to as DM, from investors by the end of 1979. Schierack and his affiliated companies subscribed and paid for 20% of the 14,000,000 DM total, and Rossbach individually purchased stock in the amount of 700,000 DM, or 5% of the total sales.

There was a provision in an agreement called "The Treugut Trustee Agreement" which prohibited the release of any funds until shares in the amount of 7,000,000 DM had been sold. Since this amount had not been sold by Rossbach by June, 1979, Schierack arranged a loan of 3,600,000 DM for USACO–Germany from the Dresdner Bank.

Shortly thereafter, a payment in that same amount was made to Carbomin by USACO–Germany. Subsequently, the balance of the payments needed to discharge the debt of $2,812,000 were made by December 21, 1979. After receiving these payments from USACO, Carbomin paid a commission of $570,656.63 to Schierack Gas. In addition, it loaned Schierack Gas 1,680,000 DM and loaned Schierack personally $100,000.

When, in 1980, Rossbach demanded that Schierack amend the Carbomin lease, Schierack offered to make the minimum royalty payments recoupable and to reduce the minimum annual production level to 100,000 tons and to lower the per ton royalty to $3.00 per ton.

With regard to the tipple site, on or about April 25, 1979, USACO–Germany placed an order with Westport in the amount of $980,000 in return for which Westport was to

construct an access road bridge and the railroad roadbed at the USACO tipple site. Prior to the execution of that contract, Worden had informed Schierack that the work could be done by Westport for $350,000 because of revenues Westport could expect from the mining of coal on the tipple site. It will be recalled that Schierack and Worden owned a 50% interest in Westport. There was also evidence that Worden and Schierack agreed that any profits derived from the sale of coal mined on the tipple site would be paid to Carbomin and Schierack. Apparently none of this information concerning the interest of Schierack and Westport, the actual cost of the work to be performed and the agreement concerning the distribution of profits was made known to Rossbach and the other investors of USACO–Germany.

Following the execution of the Westport USACO contract, $480,000 of the $980,000 contract price was paid to Westport and then endorsed over by Schierack to Schierack Gas and deposited in the Schierack Gas account. There was evidence that this $480,000 payment was a payment made pursuant to an agreement of February 2, 1979, whereby Westport and Schierack agreed that Schierack Gas would use its connections and influence with USACO to secure a five-year coal sales contract for Westport in return for which Westport agreed to pay $700,000 to Schierack Gas in two installments of $500,000 and $200,000, plaintiffs' Exhibits 182 and 189. There was also established by Schierack's testimony and other evidence that he was paid $7,000 per month by Westport for three months commencing in June, 1979.

Another interesting development occurred when USACO and A&T Manufacturing Company, Inc. of Jeff, Kentucky entered into a contract for construction of a unit train loading facility on the USACO–Kentucky tipple site. The negotiations took place in Germany and were conducted primarily by officials of A&T and Dr. Neugebauer, the technical advisor to Schierack Gas and USACO, and an employee of Schierack Gas.

On January 15, 1980, the parties agreed to a contract price of $3,500,000. Schierack then called the officials of A&T into his private office and suggested that the contract price be inflated by $750,000 to $1,000,000 and then the amount be paid back to USACO–Germany, the purpose being to circumvent certain German tax laws. The A&T officials stated they would agree to such a plan only if assured by their American lawyer and accountant of its legality. Schierack then called Rossbach into the office and told him that the contract would be increased by $400,000, and the next day it was, in fact, signed and provided for a total of $3,900,000. Subsequently, the A&T officials testified that they were informed that the $400,000 would be paid to Rossbach or USACO but later were informed to forget about the proposals. No amount was ever paid by A&T to USACO–Germany or Rossbach.

Following a meeting in May, 1980 in Germany between Rossbach and Schierack, when Rossbach questioned Schierack concerning the $480,000 transaction, Rossbach resigned as president of USACO on July 5, 1980, and Schierack agreed to complete the financing of the project and complete the unit train facility. After this development, Worden, a man whose morality is seriously in question and whose credibility is also subject to great skepticism, came to see Rossbach in Dusseldorf, West Germany and stated that Westport had never received the $480,000 payment from USACO. Reference was made by Worden to Schierack manipulating people to make his selfish gains and to Worden's opinion that Schierack was a crook.

Subsequent to that meeting a contentious stockholders' meeting was held in Germany where charges and counter-charges were made by Rossbach and Schierack and by Rossbach's attorney Getty. At that meeting, Schierack produced a notarized statement by Worden recanting his earlier statements as to the $480,000 and claiming that that sum was used to purchase stock in USACO–Germany.

There is substantial evidence to the effect that Worden converted to his own use a letter of credit and certificate of deposit of $82,290.74 which was in the Westport account and which was to be used in connection with a surface mining permit bond.

With regard to the solvency or insolvency of the defendants, the Court finds that Westport Coal Company's only asset is a parcel of mineral property near Barbourville, Kentucky which it holds for the benefit of Carbomin. No accounting statements have been produced as to Westport, but for all practical purposes, it seems to be a defunct corporation without any assets upon which a creditor could levy.

Carbomin is the owner of the Letcher County mineral property and the Barbourville mineral property. Since Columbia bought the Letcher County property for $1,500,000 and then transferred it to Carbomin for $2,200,000, and since Columbia and Carbomin are both corporate pawns of Schierack, it can be reasonably inferred that the market value of the Carbomin Letcher County property is $1,500,000. The Barbourville properties were purchased by Carbomin for $700,000 and have a value of that amount.

As to Horst Schierack individually, he submitted to the Court a statement prepared by his accountant in Germany, defendants' Exhibit 30, which depicts him as the owner of a home in Bonn-Bad Godesberg, along with real property which is stated to have a market value of 2,000,000 DM. Schierack's 60% interest in the shares of Schierack Gas KG is depicted as having a minimum value of 1,500,000 DM. Finally, his statement shows that Schierack is the owner of certificates of deposit in the amount of 2,000,000 DM. Against these assets there is listed an encumbrance of 500,000 DM attaching to the German residence.

On cross-examination, Schierack stated that he had sold the house in Germany and bought a house in Zurich, Switzerland. In addition, he was questioned extensively concerning liabilities with respect to a company called "Cryoprocess." It appears to the Court from that testimony that Schierack may well be obligated to pay 750,000 DM in order to satisfy his guarantees and liabilities in connection with that unsuccessful enterprise. It is also established that Schierack had placed what is known as an "eigentuemer grundschuld" on his German real estate in the total amount of 2,800,000 DM.

As the Court understands it, the owner in Germany who has created his eigentuemer grundschuld, hereinafter e.g., can utilize it to obtain financing at any time by a simple written assignment and delivery of it. The evidence, however, does not reflect that there has, in fact, been an assignment and delivery of an e.g. by Schierack, other than the 500,000 DM encumbrance set out in the accountant's prepared statement. In addition it should be noted that Schierack is involved in other German litigation, the outcome of which, of course, is in doubt.

The evidence, taken as a whole, indicates that Schierack was, indeed, the prime promoter and mover in the USACO project. He chose Comis Tyler as the geologist, a man of no great expertise, to conduct the test upon which the prospectus was in large part based. He chose Worden, a man of dubious integrity and of relatively little experience in coal management, to be the manager of Westport. He used the corporate structure of Carbomin to great personal advantage by requiring that Carbomin pay to Schierack Gas $637,000. from the proceeds of the non-recoupable last payment. This sum was in addition to $125,000 which was paid to LGI, and many sums paid to Intertax for their advice to USACO. He also saw to it that Columbia received a profit of $210,000 from the sale of the coal tipple to USACO, and he used the corporate structure of Westport Coal Company in an apparent attempt to divert $500,000 to Schierack Gas, purportedly in exchange for Schierack Gas using its influence with USACO to obtain a sales contract with that organization for Westport.

On the credit side of the ledger for Schierack must be balanced his guarantees, along with that of other stockholders of

Carbomin, which were made in order that USACO could receive funds with which to discharge its $2,812,000 debt to Carbomin. In addition, there must be considered the fact that Schierack, through the device of HS Investitions GmbH invested $1,400,000 in the USACO venture.

Painting with a broad brush, we then see a picture of a promoter who very cleverly used corporate devices to further his own interests. This is shown by his agreement to place Rossbach in as president of the USACO Companies and thereby enable himself to take the position that all transactions between him, Rossbach and USACO were at complete arm's length, and, in effect, that Rossbach and USACO should have adhered to the premise of *caveat emptor.*

This Court realizes that standards of corporate morality and fiduciary duties may be different in West Germany than they are in the United States, but citizens of Germany who undertake to do business in the United States are governed by the laws of this Country insofar as applicable. The case of *McCandless v. Furlaud,* 296 U.S. 140, 56 S.Ct. 41, 80 L.Ed. 121 (1935) is relevant to the case at bar. In that case, Furlaud was the president and principal shareholder of Furlaud & Company, Inc. Reuter was also a shareholder and officer of the same corporation. Kingston Corporation was a subsidiary of Furlaud. Byron Corporation and Chaucer Corporation were closely related to Furlaud and Kingston, the wife of Maxime Furlaud, being an important shareholder in Byron Corporation, and the wife of Reuter being an important shareholder in Chaucer Corporation.

Furlaud was an investment banking house and was interested in the issue and sale of corporate securities. Particularly, it was interested in a project for the formation of a corporation which would own and operate gas fields in Western Pennsylvania. Reuter, representing Furlaud, took options in the name of Kingston Corporation. Later, five tracts were acquired for $1,300,000, having been appraised at $1,700,000 by an engineer employed by Furlaud. Reuter, be-

ing unhappy with the appraisal and wanting a higher appraisal for the four remaining tracts, placed the appraisals in new engineers who valued the tracts at $5,000,-000. The purchase price paid for the nine tracts was approximately $2,600,000, whereas the appraisal was $7,000,000 for them.

After many complicated transactions, a new company known as the Duquesne Gas Corporation was formed to take over the gas fields. Its stock was bought for $500 by Furlaud. Subsequently, Duquesne agreed to pay Kingston $3,015,000 which was $565,100 more than Kingston was expected to pay to the grantors. In the meanwhile, Furlaud had increased the capital stock of Duquesne to $1,250,000 shares. Mortgage bonds were issued and sold to the public, as were stock subscriptions. After many other complex transactions, Duquesne wound up with the oil fields valued at $2,500,000, plus $365,000 in working capital. Against that it had distributed to the public bonds and notes in the face amount of $5,000,000. The bonds and notes were disposed of by Furlaud and its allies as their own and at a large profit to themselves.

The District Judge held that the appraisal was fraudulent and gave judgment against Furlaud individually and Kingston in excess of $1,800,000, being the difference between the monies realized by the promoters through the sale of bonds and notes and the amount paid to Duquesne and devoted to its proper uses.

Mr. Justice Cardozo, in writing the five to four majority opinion of the court, stated at p. 156, 56 S.Ct. at p. 45:

"Promoters of a corporation stand in a fiduciary relation to it to this extent at least, that they will be chargeable as trustees if they deal with it unconscionably or oppressively or in violation of a statute, unless the liability for such misconduct has been effectually released. (citing cases) To what extent the approval of all the shareholders will relieve them of that burden is a question not susceptible to answer without considering the nature of the wrong and the interests affected. To some extent their position

is akin to that of directors, though the limits of their duty are less definite and certain. Even for erring directors, however, there may at times be absolution if all the shareholders are satisfied. *Holmes v. Willard,* 125 N.Y. 75, 25 N.E. 1083. The interests affected by approval will shape the power to approve."

Mr. Justice Cardozo held that the conduct of the promoters and their affiliated corporations was in breach of their fiduciary duties, since about two-fifths of the money resulting from the sale to the public had been kept for the use of the promoters, the effect being to saddle the company with liens beyond the value of its assets, mortgaged and unmortgaged. The court went on to hold that "Furlaud and Kingston, having made themselves parties to a scheme whereby Duquesne was to be despoiled and its creditors were to be defrauded, became accountable ... for everything that came to them as a result of the conspiracy in excess of the consideration furnished on their side." The court held that the transaction was a unit infected with a common vice and that everything of profit arising out of the abused relation must be yielded up. See 296 U.S. at p. 164, 56 S.Ct. at p. 49.

In addition, the Supreme Court increased the recovery against Furlaud and the Kingston Corporation in the amount of $850,000 for the sale of the shares of the Byron Corporation and the Chaucer Corporation.

Applying the principles of *McCandless v. Furlaud, supra,* to the case at bar, and based on the extensive evidence produced at the preliminary injunction hearing, it would appear that the plaintiffs have a substantial probability of success with relationship to those sums of money which Schierack diverted to the use of Carbomin, Columbia and Schierack Gas, or to himself personally. Against those sums, however, must be set-off sums actually invested by Schierack or the entities controlled by him in the USACO venture.

Summarizing, it is apparent that the amounts of $637,000 and $480,000 must be considered as sums to which the plaintiffs would probably be entitled as restitution under the principles set out in *McCandless v. Furlaud, supra.* In addition, it might well be that a jury could find that the circumstances surrounding the execution of the USACO–Carbomin lease and the sale of the tipple site were transactions which in part amounted to unconscionable use by Schierack as a promoter of the powers given him as a result of that status.

The Court is aware that Rossbach is not as gullible or innocent as he would wish the Court to believe. In fact, Rossbach's failure to verify some of the information he accepted from Schierack may be reflective of his self-interest. For example, Rossbach relied completely on Tyler's glowing reports and on information furnished him by Schierack and Tyler that Tyler was an expert. Rossbach, in turn, in preparing the final prospectus, unquestionably used Tyler's report as a selling point without having bothered to make any independent inquiries as to Tyler's reputation, experience or knowledge. Rossbach's interest in preparing a glowing account in the prospectus is self-evident, since his commissions would come about as a result of third parties' purchasing USACO stock.

Another instance of Rossbach's somewhat questionable conduct concerns the meeting with the Browders in Germany when Rossbach purportedly pointed out that the addition of $400,000 to the contract was illegal, but on the same day signed the contract. In essence, the Court is asked to believe that all parties to the contract, specifically the Browders and their corporation and Rossbach on behalf of USACO, objected to the $400,000 addition as illegal, but that they ended up signing it because a third party, Schierack, asked that it be concluded.

Other problems with Rossbach's dubious credibility arise concerning the duplicate $480,000 payment. The weight of the evidence is to the effect that Rossbach had knowledge in August, 1979, that Schierack had diverted this sum for his own use when he had no legitimate reason to do so, but notwithstanding this, Rossbach continued to work with Schierack until December, 1980. Also, it should be noted that Rossbach stat-

ed that he began to mistrust Schierack in the late spring of 1980, but that he continued to work with the USACO advisers, all of whom were either companies controlled by Schierack or persons working for such companies.

In summation, the only completely innocent parties involved in the proceedings are the persons who bought stock in USACO. They have been damaged by the unconscionable conduct of Schierack, as well as to some extent by Rossbach's complicity and acquiescence in Schierack's actions until the time arose when he turned on Schierack and this litigation arose. It is the interest of these innocent stockholders and purchasers which must be protected, and the Court must now consider whether, in light of all of the facts previously recited, it has the power to issue injunctive relief which would freeze the assets held by Schierack's entities in the United States, Carbomin and Columbia, in an effort to protect these stockholders.

While this is highly unusual, and while the damaged parties are German Nationals who may have some remedies in their native country, this Court will operate under the same equity principles with respect to them as it does with respect to American citizens.

In considering the question of whether a preliminary injunction should be granted, the Court takes note of the fact that Schierack has in the past contemplated selling the Letcher County property to a Panamanian corporation, and that, as controlling stockholder in Carbomin and Columbia, he has the sole power to manage any payments that would be made as a result of the sale of those corporations and to do with them as he wishes, including the right to remove all the proceeds to Germany or any other country of his choice.

Notwithstanding these facts, Schierack, Carbomin and Columbia contend that the plaintiffs have an adequate remedy at law, in that an attachment could be secured under Kentucky law, see K.R.S. 425.301 and that a *lis pendens* could be imposed upon the realty, K.R.S. 382.440. They also con-

tend that a federal court has no authority to enter an order freezing assets of a defendant unless the order is issued at the request of the United States under the RICO statutes, or at the request of the agency, such as the Securities and Exchange Commission which is concerned with frauds upon the public and the disposition of assets by the fraudulent parties. See, for example, *Securities and Exchange Commission v. Manor Nursing Centers, Inc.,* 458 F.2d 1082 (2nd Cir. 1972) and *United States v. Bello,* 470 F.Supp. 723 (S.D.Cal.1979).

There have, as yet, been no cases decided either granting or denying to an individual suing under RICO the right to freeze the assets of a defendant. However, 18 U.S.C. Sec. 1962 has given to the courts very broad powers with respect to property owned by a defendant who has been convicted of a RICO offense, such powers including the forfeiture of any enterprise in which the defendant holds an interest. While some courts have taken a very narrow interpretation of RICO and the District Court of the Western District of Pennsylvania has held that an individual complaint under RICO must be dismissed for failure to allege noncompetitive injuries to the plaintiff, similar to those suffered by an offended plaintiff in an antitrust case, this Court respectfully disagrees with those interpretations.

However, in view of the marked uncertainty that prevails the entire area of an individual plaintiff's civil rights under RICO, this Court will hold only that the plaintiff had a right to bring an action under RICO under the facts alleged in the complaint, and that jurisdiction thus vesting in this Court, the Court has pendent jurisdiction of Counts II and III of the complaint. In light of that holding, and in light of the questionable transactions that have previously been dealt with in this opinion, and the fact that the defendant, Schierack, has no bonds or ties to the United States other than his vested interests in Carbomin, Columbia and Westport, and in light of the probability that these United States corporations could easily dispose of their holdings here and transfer the pro-

ceeds of sale to such foreign enterprises as Schierack might direct, it would seem appropriate to make it impossible for him to transfer any such proceeds or properties which are within the jurisdiction of this Court until a court of competent jurisdiction has determined finally the question of whether or not the innocent stockholders in West Germany have a rightful claim to the properties and monies held by Carbomin and Columbia in this country.

This Court realizes that any order which would freeze assets must be weighed with extreme care so that it will not prejudice the rights of independent innocent third parties who are investors by depriving the defendant corporations of their ability to generate profits. See *Securities and Exchange Commission v. Manor Nursing Centers, Inc., supra.* Therefore, the wording of the preliminary injunction which the Court will enter must be very carefully balanced so as to protect the rights of these innocent investors and the right of the defendants.

Since the plaintiffs have not requested the appointment of a receiver or trustee, and since the primary thrust in their pleadings has been in the area of damages rather than injunctive relief, defendants' contention that *De Beers Consolidated Mines, Ltd. v. United States,* 325 U.S. 212, 65 S.Ct. 1130, 89 L.Ed. 1566 (1945) holds that this Court is without authority to enter a freeze order must be carefully examined. In that case, the government sought equitable relief against several foreign corporations and several individuals based upon the charge that the defendants were engaged in a conspiracy to monopolize the commerce of the United States with foreign nations in gems and industrial diamonds in violation of the Sherman Act and the Wilson Tariff Act. The United States filed a motion for a preliminary injunction and was granted the injunction restraining all of the corporate defendants from withdrawing and from selling or disposing of any property in the United States " 'until such time as this Court shall have determined the issues of this case and defendant corporations shall have complied with its orders.' " See p. 215, 65 S.Ct. p. 1132.

The government disclaimed any reliance upon Rule 64 or Rule 70 of the Federal Rules of Civil Procedure, but the trial court relied upon Section 4 of the Sherman Act which confers jurisdiction on district courts to prevent and restrain violations of the Act. The Supreme Court held that the injunction was not authorized by the statute or by the usage of equity since it did not deal with intermediate relief of the same character as that which might be granted finally, and dealt with property which could in no circumstances be the subject-matter of any final injunction. The court further held that it was not a form of seizure of property used in offending against the statute, and that the only reason for the issuance of the injunction was as a method of providing security for compliance with other process which might conceivably be issued for satisfaction of a money judgment for contempt.

The court then discussed the argument of the government that the satisfaction was similar to the practice of issuing writs *ne exeat.* The court rejected that argument since it held that the defendant owed no debt to the United States and was not under any obligation by reason of the receipt of monies to account to the government. See 325 U.S. at pp. 221, 222, 65 S.Ct. at pp. 1134–1135.

While *De Beers Consolidated Mines, Ltd. v. United States, supra,* holds that sequestration of assets of a defendant pending recovery and satisfaction of a judgment in a legal action is not justified, it does make an exception in the case of a writ *ne exeat,* where the defendant is under a duty by reason of the receipt of monies to account to the plaintiff, citing *Ginsberg & Sons v. Popkin,* 285 U.S. 204, 208, 52 S.Ct. 322, 323, 76 L.Ed. 704 (1931). Likewise, an exception is made where property may be dealt with in any final injunction that may be entered. Here the two exceptions to the general rule come into play since the real properties which Carbomin and Columbia hold and their other assets were obtained, in essence, from the overall plan to sell the investment

rights in USACO, even though the actual money which was used to consummate these questionable transactions came from loans from the Dresdner Bank or the Schneider and Muenzing Bank.

In *United States v. First National City Bank*, 379 U.S. 378, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965), the Supreme Court held that it was proper for the District Court to enter a temporary injunction freezing the assets of a foreign corporation which were held in a New York bank, the case involving a jeopardy assessment made by the Commissioner of Internal Revenue against the foreign corporation. The Court held that the temporary injunction was appropriate to prevent further dissipation of assets, and that unlike *De Beers Mines v. United States, supra,* there was property in the United States which would be the subject of the provisions of any final decree in the cause.

The Court also held that the temporary injunction was a reasonable measure to maintain the *status quo.* See *Deckert v. Independence Shares Corporation,* 311 U.S. 282, 290, 61 S.Ct. 229, 234, 85 L.Ed. 189 and *United States v. First National City Bank, supra,* 379 U.S. at p. 385, 85 S.Ct. at p. 532.

While *United States v. First National City Bank, supra,* is not fully controlling as to this case, since it involved an Internal Revenue assessment, the general principles contained therein as to the preservation of the *status quo* and the avoidance of dissipation of assets are controlling here.

Finally, for the reasons indicated above, we have this day entered a preliminary injunction.

PRELIMINARY INJUNCTION

This action having been submitted to the Court on the motion of the plaintiffs for a preliminary injunction and on the motion of the defendants to dissolve the preliminary injunction, and the Court, having held a trial during the months of July and August without a jury, and having entered its findings of fact, conclusions of law and memorandum opinion, and being fully advised in the premises,

IT IS ORDERED AND ADJUDGED that the defendants, Carbomin Energy, Inc. (Carbomin), Westport Coal Company (Westport), William L. Worden (Worden), and Columbia Capital Corporation (Columbia) are hereby restrained and enjoined from directly or indirectly transferring, selling, assigning, dissipating, concealing, encumbering, impairing or otherwise disposing of in any manner the assets, choses in action or other property, real or personal, of Carbomin, Westport or Columbia, including but not limited to all cash or other funds, securities, real or personal property, mineral properties or mineral leases, premises, deposits in bank and trust accounts, or safety deposit boxes and other assets held by them or for their benefit; and from destroying, mutilating, concealing, altering or disposing of in any manner, any of the books, records, financial statements, records of account, general ledgers, documents, correspondence, or other property of Carbomin, Westport, or Columbia; providing that Carbomin, Westport and Columbia shall in no way be prohibited from conducting normal, day-to-day business activities, and the payment of trade payables not in excess of $5,000 each,

IT IS FURTHER ORDERED AND ADJUDGED that the Court approves as security herein the irrevocable Letter of Credit issued by the First National Bank of Louisville dated January 14, 1982 in the amount of $250,000, said letter of credit to be used as security in this action until January 3, 1983, or until further orders of this Court.

This is an appealable order and there is no just cause for delay.